**Donald R. BARRAS, et al., and James L. Slaughter, et al., Appellants,**

v.

**MONSANTO COMPANY, Appellee.**

No. A14–90–00544–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 7, 1992.

Rehearing Denied June 18, 1992.

---

**860**

Gail Magers, James M. Yeretsky, Robert Hall, Owen W. Cecil, Susan M. Marett, Houston, Russell H. McMains, Corpus Christi, Dalton L. Jones, League City, for appellant.

Jesse R. Pierce, Edward M. Carstarphen, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and CANNON, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

■ Mary Carter agreements [1] are at the center of this appeal involving 222 present and former homeowners in a subdivision adjacent to the site of a chemical plant. Prior to voir dire, the trial court informed the jury panel that the homeowners had dismissed claims they had asserted against the subdivision's homebuilders and against its developers, Farm & Home Savings Association and Ayrshire Corporation, and that they had joined them in pursuing damage claims against Monsanto Company for disposing chemicals and hazardous waste at the plant site. Actually, the homebuilders were *not* parties to the agreements.[2] The trial court's prepared statement also revealed that any money the homeowners might be entitled to receive from Monsanto would be shared between the "homeowners on the one hand and Farm & Home Savings on the other hand." After a four-month trial, followed by a week of deliberation, the jury concluded that Monsanto was not negligent and had not engaged in "abnormally dangerous" activity. After entering a final judgment, the trial court granted the homeowners' motion to disregard the jury's negative answer to the strict liability issue and held that an

---

1. The term "Mary Carter agreement" comes from the case of *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App.1967), and generally applies to an agreement between a plaintiff and one or more, but not all, defendants whereby the parties limit the financial responsibility of the settling defendant(s). That sum of money is usually reduced proportionately to the amount which the plaintiff recovers from the nonsettling defendant(s); thus, the prospect of a high-er recovery induces the settling defendant(s) to assist in the plaintiff's case. In fact, a Mary Carter agreement often expressly requires the settling defendant(s) to actively participate in the trial of the case.

2. Of course, a party not named in the releasing instrument is not relieved of liability. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971).

affirmative response was established as a matter of law. Monsanto does not appeal that ruling, but neither does it admit that its activities were a producing cause of appellants' injuries.

In 247 points of error, the homeowners attack the use of the Mary Carter agreements, as well as the jury's answers to negligence and strict liability issues. In addition, the homebuilders—Donald R. Barras, Park Avenue Homes, Inc., Travis B. Campbell, and T.B. Campbell, Inc.—raise 25 points of error, claiming they were unfairly tainted by the Mary Carter agreements, and that the jury's improper responses to negligence and strict liability questions precluded them from recovering for damage to their construction companies and personal damages caused by the failure of the businesses. We affirm.

In 1957, Monsanto promised Charles Hard and Ralph Lowe $50,000 if, within 90 days, they could successfully regenerate 100,000 pounds of spent copper from wastes that Monsanto generated in the manufacture of acrylonitrile, an essential building block in the production of acrylic textiles, fabrics, and plastic. Lowe testified that he had no knowledge of the chemical business and that Hard's knowledge of chemistry was limited to "mixing a pretty good scotch and soda." Rather, they relied on a Monsanto chemical engineer, Al Withrow, who served as Hard–Lowe's "technical angel" and a third founder of the company. Monsanto claims that it did not know that Withrow was moonlighting at Hard–Lowe until he left Monsanto in 1960 to work full-time at Hard–Lowe. The fledgling Hard–Lowe Chemical Company succeeded in the reclaiming process, and Monsanto became Hard–Lowe's first customer for refining and reprocessing chemical byproducts into resaleable commodities. From 1957 to 1982, Hard–Lowe and its successors operated on land next to where the homeowners would eventually purchase their homes in Southbend Subdivision near Friendswood. The Hard–Lowe plant site became known as the "Brio Superfund Site," as Brio Refining Co., Inc. was the last company to operate the plant prior to abandoning it.

Monsanto did not own the Hard–Lowe plant, nor did it participate in Hard–Lowe's decision to purchase the land for the refinery. However, appellants contend that Monsanto controlled Hard–Lowe's operations, directing or supervising the storage of toxic waste in unlined, earthen pits at the Brio site in disregard of state-of-the-art technology of the time. Appellants claim that Monsanto guaranteed operators of the site a $10,000 profit per month, supplied them with full-time technical assistance, and provided, repaired, and replaced their equipment and facilities. In short, owner Lowe testified that Monsanto "paid for everything." Further, the Hard–Lowe office manager testified that during the 1960s, approximately 98 to 99 percent of the plant's "chemical income came from Monsanto." In addition, Monsanto employees testified they knew of pollution problems at the site.

The homeowners claim that Monsanto's dumping of toxic waste at the plant resulted in loss of market value to the homeowners' properties, physical pain, mental anguish, and the need for future medical monitoring. In October 1984, the federal government placed the plant site on the National Priorities List as causing "an imminent and substantial endangerment to the public health or welfare or the environment because of the actual or threatened release of hazardous substances." Subsequently, Monsanto and thirteen other chemical companies, each named as a "Potentially Responsible Party" (PRP) under federal law, formed a task force to voluntarily investigate and clean up the plant site under the auspices of the Environmental Protection Agency. The trial court concluded that "Monsanto employees direct and carry out virtually all of the operations of the Task Force," and appellants claim that Monsanto's involvement in the cleanup is but a facade to cover up its central role in creating and polluting the site. Appellants contend that instead of disclosing what it knew about the dangers of the plant site, Monsanto actually encouraged people, through the Task Force, to move into the Southbend subdivision: in a June

1986 newsletter, the Task Force published that its "consensus" was that potential homeowners should "not be afraid, from a health standpoint, to buy in Southbend."

### I. Mary Carter Agreements

We begin our review with the trial court's decision to instruct the venire panel regarding the Mary Carter agreements. At a lengthy pretrial hearing on motions in limine, the appellants argued that (1) the agreements should not be introduced until after voir dire and opening statements, (2) the *amount* of the agreements should not be disclosed, and (3) the agreements should not be used to impeach testimony of the homeowners. In addition, counsel for the homebuilders stated that his clients were not parties to the agreements.

Monsanto asked the trial court to admit the agreements from the beginning of trial so the jury would know in advance the financial alignment of the plaintiffs. Monsanto sought admission of the agreements with objectionable portions deleted, and it suggested a limiting instruction that the jury not consider them for purposes of liability.

In response to Monsanto's request, counsel for appellants clarified their position by urging the trial court to make a statement from the bench advising the jury of the settlement agreements:

> What we were suggesting is that once you start down this trail there's all kinds of mischief and misimpressions that can occur so the best thing to do is for the Court to advise the jury that there has been an agreement between Farm & Home and the Plaintiffs and this has been accomplished.
>
> You announce that from the Bench and the jury understands that, yes, we have entered into an agreement and, yes, I formerly represented Farm & Home.... It comes from the Bench as an official statement from the Court and the jury should take that.

Thereafter, counsel for the homebuilders argued that the agreements should not be admitted at all, contending that they were assignments of interest, not Mary Carter agreements, and as such should not be shown to the jury.

The next day, the trial judge made clear her intention to disclose the agreements "in the initial part of voir dire" by making a statement informing the jury of the relationships and alignment of the parties, and admitting the formula, but not the amount, of the agreements. Both sides would be allowed to question the voir dire panel as to how the agreements "would affect their ability to serve and formulate opinions in the case."

Before voir dire began, the trial court read the following instruction to the panel:

> The plaintiffs in this case now own or did own houses in the Southbend Subdivision, have entered into agreements with Farm & Home Savings Association and Ayrshire Corporation, the two companies that developed the Southbend Subdivision, and with Pulte Home Corporation, Ryland Group, Inc., T.B. Campbell, Inc., Park Avenue Homes, Inc., and Donald Bauer [sic], all of whom built and sold homes in the Southbend Subdivision, whereby the developers and homebuilders have paid the plaintiff homeowners a sum of money and have agreed to pay them more money in the future regardless of the verdict in this case.
>
> In exchange for those payments, the plaintiff homeowners have dismissed the claims they were asserting against the developers and homebuilders.
>
> As part of those agreements, the plaintiff homeowners and Farm & Home Savings Association and Ayrshire Corporation, along with Pulte Home Corporation, Ryland Group, Inc., T.B. Campbell, Inc., Park Avenue Homes, Inc. and Donald Bauer [sic] have agreed to cooperate in the pursuing of this lawsuit against Monsanto.
>
> In the event it is ultimately decided in this case that the plaintiff homeowners are entitled to receive any money from Monsanto, that money will be shared between the plaintiff homeowners on the one hand and Farm & Home Savings on the other hand.

No objection was made. The trial court invited counsel for appellants to proceed, and voir dire began.

■■■ The Texas Supreme Court has stated that settlement agreements between a plaintiff and a co-defendant should be excluded from the jury; however, when a settling defendant retains a financial stake in the plaintiff's recovery, excluding evidence of that fact from the jury is harmful error. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857–59 (Tex.1977). As such, the parties' financial interest in the outcome of the case is a proper subject of disclosure by direct evidence or cross-examination. *Id.* at 857. We fully recognize a continuing debate over whether Mary Carter agreements should be admitted, and, if so, at what point during the trial and for what purposes.[3] However, we reserve our sentiments on the subject of Mary Carter agreements, as such comment would be mere dicta, because appellants failed to timely object to the trial court's instruction. The interchange between the judge and appellants' attorneys at the pretrial hearing did not preserve error. A timely objection at trial was required. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 637 (Tex.1986); *Hartford Acc. & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex.1963). In the absence of a proper, timely objection to the judge's instruction, appellants waived any error. *See Urquhart v. Antrum*, 776 S.W.2d 595, 596 (Tex.App.—Houston [14th Dist.] 1988, no writ).

■■■ It is particularly puzzling that the homebuilders failed to object to the trial court's misstatement including them as a party to the agreements. In fact, during voir dire, counsel for the homebuilders told the panel, "Everything [the judge] says to you as a juror, if you serve in this case, is something that you had better believe and you need to follow." It was not until approximately eight hundred pages into the Statement of Facts, when Monsanto's counsel identified the ratio or formula by which the parties would share in a judgment pursuant to the agreements, that the homebuilders joined the other appellants in moving for a mistrial on the basis that Monsanto should not have disclosed a 60/40 split to the jury. The trial court denied the motion for mistrial, but sustained appellants' objection to Monsanto's mention of the formula, and instructed the jury to disregard comments on the formula. Counsel for the homebuilders complained that he wanted "out of that innuendo," and the trial court complied by instructing Monsanto's attorney to explain to the jury that the homebuilders were not parties to the agreements. He did. In closing arguments, the homebuilders again complained that they were not parties to the Mary Carter agreements, but even then, their objections were not particularly specific and certainly not as effective as pressing the trial court to definitively instruct the jury that the homebuilders were not parties to the Mary Carter agreements.

Throughout its cross-examination of the homeowners, Monsanto referred to the agreements, primarily without objection.

---

3. In his concurring opinion in *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1 (Tex.1986), Justice Spears expressed his readiness to hold Mary Carter agreements "void as against public policy." However, "until that occurs," he endorses that "they be fully disclosed to the court and the jury to lessen their inequity." Justice Spears reasoned that the trial court must know of the Mary Carter agreements to fairly align parties, equalize jury strikes, and determine how examination of adverse witnesses should proceed. The jury should know "at the start of trial or immediately upon formation" the fact and nature of the Mary Carter agreements to help jurors "understand the strange alignment of the parties and to weigh the plaintiff's and settling defendant's evidence" and their "altered behavior." *Id.* at 9–10. Recently, the supreme court has denied writ in cases in which the jury was informed of defendants' financial interest in the plaintiff's recovery *prior to* voir dire, *Webster v. Lipsey*, 787 S.W.2d 631, 639 (Tex.App.—Houston [14th Dist.] 1990, writ denied). Further, Texas Rule of Evidence 408 does not limit admissibility of the agreements to impeachment only; unlike its federal counterpart, the Texas rule allows evidence of settlement agreements to show the "interest of a witness or a party." *Id.* at 10 (quoting Blakely, *Commentary to Article IV*, 20 Houston L.Rev. 1 & 2, Texas Rules of Evidence Handbook 242 (1983)). Justice Spears concludes that the language of the Texas rule allows Mary Carter agreements to be admitted from the beginning of trial, for example, as here, where the settling defendant directs the plaintiff's case.

In at least one instance, however, appellants objected and the trial court stated that the reference went beyond the pretrial orders; on a few other occasions, appellants failed to get a ruling from the court. Appellants particularly complain about statements made by Monsanto's counsel during closing arguments. Again, however, they waived error by either not objecting or by not following up a sustained objection with a request for an instruction to disregard. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840–41 (Tex.1979); *Chevron U.S.A., Inc. v. Lara,* 786 S.W.2d 48, 52 (Tex.App.—El Paso 1990, writ denied); *Fowler v. Garcia,* 687 S.W.2d 517, 520 (Tex.App.—San Antonio 1985, no writ).

Because appellants failed to preserve error for our review, we overrule the homeowners' points of error 241 through 247 and the homebuilders' points of error seven, eight, and nineteen through twenty-five.

## II. Strict Liability and Negligence Claims

The trial court submitted twelve questions to the jury concerning (1) strict liability for abnormally dangerous activities, and (2) negligence liability.

■ Regarding strict liability, in the homeowners' first two points of error and the homebuilders' points of error four, five, and six, appellants contend that, as a matter of law, Monsanto's activities in regard to the waste site were abnormally dangerous and a producing cause of damages to the appellants. Federal law identifies acrylonitrile, ethylbenzene and vinyl chloride—materials stored and/or disposed of at the site—as hazardous substances. 42 U.S.C. §§ 9601–02 (West 1983 & Supp. 1991); 40 C.F.R. § 302.4 ("List of Hazardous Substances and Reportable Quantities") (1990). Section 19 of the Restatement (Second) of Torts, provides:

> (a) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

> (b) This strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous.

However, Texas has not adopted that portion of the Restatement, and our courts have rejected the doctrine of abnormally dangerous activities as a basis for strict liability. In the absence of some other showing, such as negligence, there is no basis for recovery. *Robertson v. Grogan Investment Co.,* 710 S.W.2d 678, 679–80 (Tex.App.—Dallas 1986, no writ) (citations omitted); *see, e.g., Turner v. Big Lake Oil Co.,* 128 Tex. 155, 96 S.W.2d 221, 221–22 (1936). Mere knowledge of a dangerous situation imposes only a moral duty to warn or render aid, not a legal duty. *Ford Motor Co. v. Dallas Power & Light Co.,* 499 F.2d 400, 412 n. 20 (5th Cir.1974) (citing *Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109, 110 (1942) (no liability for defendant who did not create dangerous situation, although aware of the danger and failed to warn)).

■ Monsanto objected to the submission of a jury issue on "abnormally dangerous" activities on the basis that, in jurisdictions that have adopted the Restatement position, whether an activity is abnormally dangerous is a question of law that the jury may not resolve. *See, e.g., Yukon Equipment, Inc. v. Fireman's Fund Ins. Co.,* 585 P.2d 1206, 1210 (Alas.1978). Nevertheless, Question No. 4 asked whether Monsanto's activity in regard to the Brio site was abnormally dangerous, and the jury answered "No." The next question, which asked whether such activity was a producing cause of damages to appellants, was conditioned on an affirmative response to Question No. 4, therefore the jury did not answer it.

Texas Rule of Civil Procedure 272 provides, *inter alia,* that an objection to the court's charge which is not made prior to its submission to the jury "shall be considered as waived." On this basis, it has been held that:

> Where the court instructs the jury to answer a special issue conditioned upon an affirmative finding to another issue

which should not have been given because inquiring about an undisputed established fact, and the jury in compliance with the instruction fails to answer the disputed issue because of not having made such an affirmative finding to the preceding issue, a party who did not object to the conditional submission waives the right to have the issue answered, and also necessarily waives the right to any benefits which he might receive to a favorable answer to such issue.

*Bell v. Aetna Casualty & Surety Co.*, 394 S.W.2d 830, 833 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.); *see also Creole Production Services, Inc. v. Harper*, 640 S.W.2d 727, 729–30 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Hopkins v. Standard Fire Ins. Co.*, 554 S.W.2d 270, 273 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). Although the trial court held as a matter of law that Monsanto's activities were "abnormally dangerous," appellants cannot recover because the jury did not find Monsanto negligent, much less that its activities were a producing cause of appellants' damages. Therefore, we overrule the homeowners' first two points of error and the homebuilders' points of error four, five, and six.

Regarding negligence, in response to Question No. 1 the jury found that Monsanto was not negligent in its acts or omissions in regard to the Brio site. The next two questions were predicated on an affirmative answer to the negligence question, therefore the jury did not answer them. In the homebuilders' first three points of error and the homeowners' fifth point of error, appellants contend that Monsanto was negligent as a matter of law or that the great weight and preponderance of the evidence established that Monsanto breached its duty to exercise reasonable care not to endanger the homeowners, to correct dangers once they occurred, and to warn of the dangers that it created. In points of error nine through twelve raised by the homebuilders, and in points of error three, four, and six brought by the homeowners, appellants also challenge the jury's finding that 100 percent of the negligence can be attributed to the developers.

First, appellants claim that Monsanto shipped millions of pounds of hazardous waste to the Brio site, knowing that if released they would be highly dangerous to persons or property in the vicinity. They claim that Monsanto authorized and consented to dumping the chemicals into crude, unlined pits from which the chemicals could and did escape into the air, water, and soil. Second, appellants contend that Monsanto made the business decision to continue its policy to "get rid of this material at all costs" by disposing of or processing materials at the site when the plant was under court order to remove styrene tars from its pits. Monsanto did not take corrective action until the E.P.A. designated it as a PRP in 1984. Third, appellants contend that Monsanto, as the party that created the dangerous situation and/or controlled plant operations, failed in its continuing duty to warn of the dangers associated with the site. *Ford Motor Co. v. Dallas Power & Light Co.*, 499 F.2d at 412–13.

■ In determining whether the evidence is factually sufficient to support the jury's findings, or whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust, we review the entire record, both that which is favorable to the verdict and that which militates against it. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651–52 (Tex.1988); *Pool v. Ford Motor Co.*, 715 S.W.2d at 635. Evidence contrary to the findings must "greatly outweigh" the evidence in support of the verdict. *Id.* If the jury was presented with evidence sufficient that reasonable minds could differ, we may not substitute our opinion for that of the jury merely because we may have reached a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 213 (Tex.App.—Houston [14th Dist.] 1991, no writ).

■ In weighing the divergent evidence to arrive at the most reasonable conclusion, the jury was free to believe or disbelieve all, part, or none of the testimony present-

ed by appellants. *Fichtner v. Richardson,* 708 S.W.2d 479, 483 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Hebert v. Pan Am. Van Lines, Inc.,* 681 S.W.2d 221, 222 (Tex. App.—Houston [14th Dist.] 1984, no writ). For example, the jury could have disregarded much of Lowe's testimony regarding Monsanto's alleged control of the plant once they learned that originally Lowe was sued as the responsible party and was dismissed as a defendant prior to his testimony.

Instead, the jury was entitled to believe Monsanto's claim that it did not direct or supervise the creation of permanent storage pits at the Brio plant site. To the contrary, Monsanto paid for the plant to regenerate its waste into a rejuvenated product that would be *returned* to Monsanto's Texas City plant. Monsanto explained that its employees regularly visited the plant for at least three reasons: to monitor the application of the formula used to determine how much Monsanto owed under the catalyst regeneration contract; to help devise ways to boost the yield of regenerated copper; and, during a specific two-year period, to assure Monsanto's interest in a project based on a cost-plus contract with the plant.

The jury also was free to believe expert testimony that the plant complied with industry standards and the highest state of the art for handling of chemical byproducts during the relevant time period. Dr. Earnest Gloyna, a professor of environmental engineering, testified that the pits were constructed with an impermeable clay liner and used only for short-term storage of inventory material. As such, the plant was a "reprocessing facility" that did not endanger the public health, and it was "perfectly proper" and "certainly not negligent" for Monsanto to sell or send waste to the plant for reclamation. Gloyna found use of the pits preferable to other technology of the time, including incineration and hydrocracking. In addition, state regulatory agencies monitored, advised, and consented to use of the pits, and the E.P.A. took no action against the site for operation of the pits.

Having considered all of the evidence, we hold that it was sufficient to support the jury's finding that Monsanto was not negligent. We overrule the homebuilders' first three points of error and the homeowners' fifth point of error.

In addition to supporting the jury's conclusion that Monsanto was not negligent, there is sufficient evidence of 100 percent liability on the part of the developers for creating a residential subdivision in a rural area next to a remote chemical plant whose operations were open and obvious, and for failing to inform potential homebuyers that the plant stored chemical byproducts in pits located on the premises. The Environmental Impact Statement prepared in 1978 for the proposed subdivision put the developers on notice of styrene tars emitting unpleasant odors from the plant, and the Texas Department of Water Resources (TDWR) notified the developers that waste material generated at the Brio site was surfacing and migrating toward Southbend; a report attached to TDWR's letter described the location, size and contents of fourteen pits within the plant. Nevertheless, according to testimony, the developers did not properly investigate the area's suitability for residential housing, confer with operators of the plant, or consult state environmental agencies. Dr. Mike Miles, an expert in real estate investment and development, testified that it is "irresponsible" for developers to fail to investigate and/or disclose negative results of their investigation regarding potential problems to prospective homebuyers. Moreover, the developers have not appealed the jury's answer, therefore the trial court's judgment as to them must be affirmed. *Hancock v. City of San Antonio,* 800 S.W.2d 881, 885 (Tex.App.—San Antonio 1990, writ denied). The homeowners' third, fourth, and sixth points of error and the homebuilders' points of error nine through twelve are overruled.

In the homeowners' points of error seven through 240, appellants contend that the jury's answer of no damages for the homeowners' loss of market value of house and property was manifestly unjust and against the great weight and preponderance of the evidence. Although an expert testified that proximity to the Brio site reduced the

value of single family residences in South-bend by $7,335,700, the jury awarded the homeowners nothing. In the home-builders' points of error thirteen through eighteen, they contend (1) their damages were established as a matter of law, and (2) the jury's failure to award them damages was against the great weight and prepon-derance of the evidence and was manifestly unjust. However, the jury's failure to com-pute the amount of damages attributable to the developers' negligence in no way makes the judgment regarding Monsanto improp-er. As discussed above, the jury properly found that Monsanto was not liable; in the absence of liability, the failure to award damages becomes immaterial. *Eoff v. Hal and Charlie Peterson Foundation,* 811 S.W.2d 187, 194 (Tex.App.—San Antonio 1991, no writ); *Turner v. Lone Star Indus., Inc.,* 733 S.W.2d 242, 246 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Dewitt v. Prudential Ins. Co.,* 717 S.W.2d 414, 418–19 (Tex.App.—Houston [14th Dist.] 1986, no writ); *Johnson v. White-hurst,* 652 S.W.2d 441, 449 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). We overrule the homeowners' points of er-ror seven through 240 and the home-builders' points of error thirteen through eighteen.

The judgment of the trial court is af-firmed.