SAGE STREET ASSOCIATES, 3525 Sage Street Associates, and Marvin B. Myers, Appellants,

v.

NORTHDALE CONSTRUCTION COMPANY, Robert B. Evans and Federal Insurance Company, Appellees.

No. B14–90–00311–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 25, 1994.

Rehearing Overruled Oct. 6, 1994.

David T. Harvin, Betty R. Owens, Gregory N. Jones, Houston, for appellants.

William M. Coates, Yocel Alonso, W. James Kronzer, Leslie C. Taylor, Geoffrey H. Bracken, Houston, for appellees.

Before MURPHY, DRAUGHN and ELLIS, JJ.

## OPINION ON REMAND FROM THE SUPREME COURT OF TEXAS

MURPHY, Justice.

This case comes before us on remand to determine the sufficiency of the evidence to support the jury's finding of damages in favor of appellee Northdale Construction Company. We find the evidence is sufficient, and affirm.

The Supreme Court of Texas has extensively reviewed the facts of this case in its opinion reported at 863 S.W.2d 438. In short, a construction contract was entered into between Northdale, through its president Robert B. Evans, and Sage Street Associates, through its general partner Marvin B. Myers. Federal Insurance Co. was the bonding company involved in the construction project. The contract called for Northdale to build a high-rise apartment building for Sage Street. During the construction, disputes arose between the parties, which culminated in Sage Street terminating Northdale from the project. The parties filed separate suits which were consolidated for trial. The jury found that Northdale was entitled to damages of $2,491,110 due to Sage Street's wrongful termination of the contract.

This Court affirmed the jury's award, holding that testimony supported a damage figure greater than the jury's finding. *Sage St. Assoc. v. Northdale Constr. Co.*, 809 S.W.2d 775, 778 (Tex.App.—Houston [14th Dist.] 1991). The Texas Supreme Court remanded the case, finding that this Court erred in failing to apply the appropriate review standard to the issue of whether the evidence was sufficient to support the jury's award. *Sage St. Assoc. v. Northdale Constr. Co.*, 863 S.W.2d 438, 447 (Tex.1993). According to the supreme court's opinion, our task is to determine whether the evidence is sufficient to support the damage award "under the theory submitted to the jury." *Id.*

In reviewing a factual insufficiency challenge, the appellate court must consider all of the evidence in the record, both supporting and contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). After considering and weighing all the evidence, the court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). It is up to the jury, as trier of fact, to judge the credibility of witnesses, and resolve conflicts and inconsistencies in testimony. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 579 (Tex.App.—Houston [1st Dist.] 1992, no writ). This court is not a factfinder, and we may not substitute our judgment for that of the jury, even if a different answer could be reached on the evidence. *St. Paul Medical Ctr. v. Cecil*, 842 S.W.2d 808, 813 (Tex.App.—Dallas 1992, no writ); *Barras v. Monsanto Co.*, 831 S.W.2d 859, 866 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

Because we are to determine the sufficiency of the evidence under the theory submitted to the jury, we examine the court's charge to establish what the jury was asked to take into consideration in making its decision. The charge submitted to the jury on the damages issue stated:

> What sum of money, if any, do you find from a preponderance of the evidence is due to Northdale from Sage Street pursuant to the contract for the work it performed, its overhead, and its profit, if any.

The jury answered: $2,491,110.00. We find there is ample evidence in the record to support this damage award.

The jury was first asked to calculate the amount of money owed Northdale for the work it performed. There is some disagreement in the record as to what this value was. Robert Evans, president of Northdale, testified that Northdale spent approximately $13.1 million before it was terminated. This number is supported by Northdale's cost report for 1985, which shows expenditures on the project of $13,113,553.[1] On the other hand, Northdale's last pay application shows expenditures totalling $12,625,770, to which is added unpaid change orders in the amount of

---

1. For simplicity, all amounts are rounded off to    the nearest dollar.

$328,099 and unpaid utilities and testing of $59,314, for a total of **$13,013,183.**

There is also a disagreement about how much Northdale had been paid by Sage Street before the termination. Northdale's last pay application supports a figure of **$11,-014,165,** while Sage Street's check disbursements show a total of **$11,103,204,** including a payment of $89,039 at the closing of the contract. These figures result in four possible calculations of amounts for what Northdale was owed pursuant to the work it performed on the project prior to termination: (1) $13,113,553 − 11,014,165 = **$2,099,388;** (2) $13,113,553 − 11,103,204 = **$2,010,349;** (3) $13,013,183 − 11,014,165 = **$1,999,018;** or (4) $13,013,183 − 11,103,204 = **$1,909,979.**

■ The jury was also asked to consider Northdale's overhead and profit, if any. The above values for work performed are all below the damages awarded by the jury; therefore, the next issue for us to decide is whether the evidence was sufficient to support a finding that the parties intended for Northdale to receive a $760,000 profit in addition to what it was owed for the work performed.

Robert Evans testified that he specifically discussed the $760,000 profit with Marvin Myers, Sage Street's general partner and representative. Myers told Evans that the profit was "sacred," and Northdale would receive the costs of the project plus $760,000, no matter what the project ultimately cost. This testimony was corroborated by Michael Roszyk of Skyline Construction Management, and by George Willock, Northdale's former manager of marketing, both of whom were present for the meeting at which Myers made the "sacred" remark. Myers testified that he only guaranteed that profit up to the contract price of $13,535,000, but if the costs of the project went over the contract price, Northdale's profit would be reduced accordingly. No witnesses or documentary evidence corroborated Myers's interpretation of the parties' agreement.

The two contracts on which the dispute is based were contradictory and ambiguous as to the $760,000 profit. The first contract was signed on March 7, 1984, and within itself contained inconsistent clauses. One clause in the contract stated that Sage Street was to pay Northdale $13,535,000, or the cost of the work certified to HUD, whichever was smaller. However, another clause stated that Northdale was to receive $760,000 without regard to costs, through an overhead allowance of $261,159.00, and $498,841.00 in profit and overhead through a subcontract with a Northdale affiliate.[2]

The second contract, signed on March 27, 1984, was executed so that Sage Street could obtain initial financing for the project through the Federal Housing and Urban Development (HUD) financing program. However, the evidence showed that Myers planned to obtain a conventional loan later and discontinue the HUD loan, in order to upgrade the project from moderate income apartments to luxury condominiums. Several witnesses testified that the HUD contract was considered only a formality because of the plan to discard the HUD loan once the project was underway. Because of HUD regulations, which disallowed a profit by the builder, the HUD contract had a clause which stated that the owner (Sage Street) was to pay the contractor (Northdale) a fee of "$ NONE."

Thus, we have conflicting evidence regarding whether the parties intended for Northdale to receive the $760,000 profit regardless of the costs of the project, or whether the profit was to be included within the contractual price. In its opinion, the supreme court found that this ambiguity was submitted to the jury when it was asked to consider what profit, if any, was due Northdale. *Sage St.,* 863 S.W.2d at 445. When we view the evidence in the light most favorable to the jury's verdict, we find that it supports the interpretation that Northdale was to receive a profit of $760,000 regardless of the costs of the project. According to several witnesses, Myers told Evans the $760,000 was "sacred" and Northdale would receive that amount as profit, even if the costs of the project exceed-

---

**2.** Notably, Northdale's expert accounting witness testified that even if the profit was built into the contract price, because Northdale had not been paid for approximately $2 million of work it had performed, it had not received *any* profit.

ed the contractual ceiling. The jury, as the sole judge of the credibility of the witnesses, was entitled to believe those witnesses over Myers, who claimed that he only guaranteed $760,000 if the project came in under the contract price. *See Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 713 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Further, because the contract clauses are ambiguous, the jury was free to interpret the contracts as evidencing the parties' intent that Northdale should receive $760,000 profit in addition to the costs of the project.

■ Because there is sufficient evidence to support a finding that the parties intended for Northdale to receive the $760,000 profit, that figure must be added to the above calculations for work performed to arrive at a total supportable damages figure. The results of such addition are: (1) $2,859,388; (2) $2,770,349; (3) $2,759,018; or (4) $2,669,979. All of these figures exceed the $2,491,110 awarded by the jury, which shows that the jury's finding is well within the range of evidence of losses suffered by Northdale as a result of Sage Street's wrongful termination of the contract. *Adams,* 754 S.W.2d at 709. Although the jury's award does not precisely match any of the above possible calculations, we are not to substitute our thought processes for that of the jury, even when the jury's method of arriving at a damage award may be unclear to us. *Id.* at 709–10.

■ Appellants argue that this Court must consider the costs expended by them in completing the contract, and if this figure is taken into account, the evidence will not support the jury's award. In support of their argument, they point to language in the supreme court's opinion which states that this Court omitted from its computation the expenses avoided by the contractor by not completing the job. *Sage St.,* 863 S.W.2d at 447. However, the cost to complete is not one of the factors the jury was asked to take into account when making its calculation of what Northdale was owed, if anything. *Id.* at 443 n. 9. As discussed above, the jury was asked to determine the amount owed pursuant to the work Northdale performed, its overhead, and its profit, if any. The cost to complete the contract could have figured in the amount Northdale was to receive as a profit. However, viewing the evidence in the light most favorable to the jury's verdict, we find that the cost to complete does not comprise one of the measures of Northdale's damages according to the evidence presented to the jury. Not one witness discussed cost to complete as a factor in determining Northdale's damages, and the cost to complete was discussed *only* in the context of Sage Street's recovering damages if the jury found that Sage Street was justified in terminating Northdale, which did not occur. We therefore have no need to consider cost to complete in our review of the sufficiency of the evidence to support the award *under the theory submitted to the jury.*

We hold that the jury's verdict is supported by factually sufficient evidence, and is not against the overwhelming weight of the evidence so as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Texmarc Conveyor Co. v. Arts,* 857 S.W.2d 743, 745 (Tex.App.—Houston [14th Dist.] 1993, writ denied). Accordingly, we affirm the judgment of the trial court.