Susan PRATHER, Appellant,

v.

Duane BRANDT and Mike Copper Brandt, Appellees.

No. 01–97–00532–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 8, 1998.

---

Tom Edwards, Patrice M. Barron, Houston, for appellants.

Britton B. Harris, Terri S. Harris, Houston, Ruben Hope, Jr., Kenna M. Seiler, Conroe, for appellees.

Before O'CONNOR, TAFT, and SMITH,[1] JJ.

## OPINION ON MOTION
## FOR REHEARING

O'CONNOR, Justice.

Susan Prather, the appellant and plaintiff below, appeals a take-nothing judgment in favor of Duane and Mike Brandt, appellees and defendants. On motion for rehearing, we overrule the motion, withdraw our earlier opinion, and issue this one in its stead. We affirm.

1. The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

This is a case arising out of a drive-by shooting in which Susan was injured. The trial court granted Duane's motion for a directed verdict. After the jury refused to find Mike proximately caused Susan's injury, the trial court entered a take-nothing judgment in favor of Duane and Mike.

### A. Background

On the evening of July 23, 1994, Susan Prather was shot three times by a person standing in the back of a Bronco truck owned by Duane Brandt. The Bronco was being used by Duane's son, Mike Brandt, and two of his friends, Gabe Vertz, and Danny Bothman, all of whom were 17 or 18 years old at the time. The shotgun was a Christmas present to Mike from Duane. Danny was driving the Bronco, and either Gabe or Mike did the shooting.

Susan sued Mike and Duane for her injuries. She alleged Duane was liable to her based on the following theories of recovery: (1) vicarious liability for the conduct of Mike and Gabe, (2) negligence for failure to maintain reasonable control over the use of the shotgun, an inherently or abnormally dangerous instrumentality, (3) negligent entrustment of the shotgun to his son, (4) negligence in controlling Mike's conduct, and (5) negligence in not ensuring that Mike removed the shotgun from the Bronco. Against Mike, Susan alleged the following theories of recovery: (1) vicarious liability for Gabe's acts, if Gabe was the shooter, (2) alternatively, negligence and assault and battery if Mike was the shooter, (3) negligent entrustment of the gun to Gabe, and (4) negligence in not securing the gun from Gabe. She sought damages totaling $15,000,000.

After Susan rested, Duane moved for a directed verdict, arguing there was no evidence he knew of, consented to, sanctioned, or participated in Mike's illegal activities. He argued there was no evidence that Mike had a propensity for irresponsible behavior, and that Duane could not be held liable for negligent entrustment of the shotgun and shells or negligent supervision of a child. Susan argued strict liability should be applied to Duane. The trial court granted Duane's motion as to all matters.

Susan's claims against Mike were submitted to the jury. The jury was asked, "Did the negligence, if any, of Mike Cooper Brandt proximately cause the shooting of Susan Prather," to which it answered, "No." The trial court rendered judgment that Susan take nothing from Mike and Duane.

### B. Strict Liability

In issue number four, Susan argues the trial court erroneously refused to submit to the jury her strict liability causes of action against Duane and Mike. She argues they should be held strictly liable for her injuries because the shotgun was an inherently dangerous instrumentality and Mike's actions on the night she was shot were abnormally dangerous. Susan admits no Texas precedent supports the application of strict liability to owners of guns used to injure someone. She argues instead that public policy supports such a rule. We disagree.

Texas does not recognize a cause of action of strict liability for "ultrahazardous" or "abnormally dangerous" activities. *See Turner v. Big Lake Oil Co.*, 128 Tex. 155, 96 S.W.2d 221, 226 (Tex.1936); *Barras v. Monsanto Co.*, 831 S.W.2d 859, 865 (Tex.App.—Houston [14th Dist.] 1992, writ denied) (stating "our courts have rejected the doctrine of abnormally dangerous activities as a basis for strict liability"). Strict liability is imposed only in very limited situations, such as in products liability cases involving dangerously defective products or dangerous animal cases. *See Firestone Steel Prod. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex.1996) (involving defective products); *Marshall v. Ranne*, 511 S.W.2d 255, 258 (Tex.1974) (involving animals known to be vicious). Texas has not adopted section 19 of the RESTATEMENT (SECOND) OF TORTS, regarding liability for abnormally dangerous activities. *Barras*, 831 S.W.2d at 865.

We decline to apply strict liability to Susan's claims against Duane and Mike. We overrule Susan's argument in issue number four that she was entitled to try her strict liability cause of action against Duane and Mike.

## C. Claims against Duane

In issue number one, Susan argues the trial court erred in directing a verdict for Duane. She argues there was some evidence Duane was negligent and proximately caused the shooting and her injuries.

### Standard of Review

A movant is entitled to a directed verdict when (1) the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law, or negates the right of the nonmovant to judgment, or (2) the evidence offered is insufficient to raise a fact issue on the cause of action at issue. *Metzger v. Sebek*, 892 S.W.2d 20, 40 (Tex.App.—Houston [1st Dist.] 1994, writ denied). When a trial court grants a motion for directed verdict without stating the specific ground or grounds on which it is relying, as is the case here, the verdict must be upheld if any of the grounds stated in the motion are meritorious. *Id.*

In reviewing the granting of a directed verdict, we must determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Metzger*, 892 S.W.2d at 41. We consider all the evidence in the light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *Szczepanik*, 883 S.W.2d at 649; *Metzger*, 892 S.W.2d at 40. The trial court should not weigh the credibility of the witnesses in determining whether to grant a directed verdict.

### Facts for Duane's Directed Verdict

Duane testified that Mike was respectful and had always gotten along well with the family. Duane did not think Mike was involved in gang activity and never saw him with gang clothing, paraphernalia, or tattoos. At school, Mike received good conduct grades and was never expelled, suspended, or given detention. Duane was never notified that Mike had been punished or had behaved badly or disrespectfully. Mike's parents, Duane and his wife, Constance, met with Mike's teachers at parent association meetings and always received good reports. Duane never heard that Mike was involved in fights or acted irresponsibly in the neighborhood. The only report Duane ever received was a compliment from a neighbor on Mike's care when driving in the neighborhood. Mike had his driver's license and had not received any tickets or been in any wrecks.

Duane testified he taught Mike about the safe use of a shotgun and not to use a shotgun in a motor vehicle. Mike took a professional gun safety course to secure his hunting license. Duane said the family rule was never to put a loaded gun in a car. He taught Mike never to aim a gun, loaded or not, at something he did not intend to shoot. He also told Mike not to permit anyone else to use the gun unless that person was properly trained. Duane said the shotgun was usually kept in Mike's closet, separate from ammunition, which was kept in Duane's room. According to Duane, the usual routine when bringing shotguns home was to unload the guns, bring them home, clean them, and then put them away. Before the shooting, Duane never had any problems with Mike not putting his gun away after using it.

Duane knew Gabe and Danny and said both were nice, good boys. Duane taught Gabe some gun safety rules and said Gabe always handled guns very safely when Duane was around. At the time of the shooting, Duane did not know Gabe was on medication for mental problems.

Duane said he talked to Mike on Thursday morning, about two days before the shooting. Mike was going fishing at the family's farm that morning, and Duane told Mike to take the gun with him because there were water moccasins in the creek where they fished. Duane also told Mike to take a partial box of shotgun shells from Duane's closet. Neither of Mike's parents drove the Bronco between Thursday, when Mike took it to the farm, and Saturday, the night of the shooting. Until Duane learned of the shooting, he thought Mike had taken the shotgun out of the truck and returned it to the closet. He did not check to make sure the gun was returned, but assumed it was because Mike had always done so in the past. Duane did not make

sure the ammunition was returned after the fishing trip because he did not expect any shells to be left.

On Saturday night, Duane gave Mike permission to spend the night at Danny's house. Mike left at approximately 10:00 or 10:30 p.m. Duane did not smell any alcohol, and told Mike to be home by 9:00 a.m. the next day. After the shooting, Duane asked the boys whether they had been drinking that night, and Mike said they had not. Duane asked because he knew Gabe's family kept alcohol in their house and he had smelled alcohol on Gabe's breath once before. Duane said he had no knowledge that Mike had ever had alcohol before the shooting. Duane said the family's rule was that Mike was not to drink until he was 21 years old.

Duane admitted a loaded shotgun was extremely dangerous and could cause injury or death. He said giving a loaded shotgun to an untrained person could be extremely dangerous. He said it was dangerous and not common or acceptable for teenagers to drive around with loaded shotguns in their cars.

### 1. Negligent Entrustment of a Firearm

■ The only Texas case regarding negligent entrustment of a firearm is *Kennedy v. Baird,* 682 S.W.2d 377 (Tex.App.—El Paso 1984, no writ). The *Kennedy* court analogized negligent entrustment of a firearm to negligent entrustment of an automobile. *Id.* at 378–79.

■ A person who gives a chattel to another, knowing the other person, due to youth, inexperience, or other factors, is likely to use the chattel in a manner involving unreasonable risk of harm to himself or others, may be held liable for harm caused by the use of the chattel. RESTATEMENT (SECOND) OF TORTS § 390 (1965); *see also Rodriguez v. Spencer,* 902 S.W.2d 37, 42 (Tex. App.—Houston [1st Dist.] 1995, no writ) (parent may be liable if he gives child instrumentality which, because of child's youth or inexperience, may be dangerous).

■ To establish negligent entrustment of an automobile, a plaintiff must prove the following elements: (1) the owner entrusted the automobile (2) to a person who was an incompetent or reckless driver, (3) who the owner knew or should have known was incompetent or reckless, (4) the driver was negligent, and (5) and the driver's negligence proximately caused the accident and the plaintiff's injuries. *Soodeen v. Rychel,* 802 S.W.2d 361, 362 (Tex.App.—Houston [1st Dist.] 1990, writ denied).

Applying the same requirements to Duane's entrustment of the shotgun to Mike, Susan did not prove Duane knew or should have known Mike or Gabe was incompetent, reckless, or otherwise likely to act negligently with the shotgun. Duane's testimony showed he had always taught Mike and Gabe to be responsible with the shotgun, Mike had always followed Duane's rules and acted responsibly in the past, and Duane had no reason to believe Mike would be negligent and not follow Duane's rules on the night of the shooting. Susan did not produce any evidence contrary to Duane's proof. The trial court properly granted a directed verdict in Duane's favor as to Susan's negligent entrustment of a firearm claim.

### 2. Duane's Negligence

■ Generally, a defendant has no duty to prevent the criminal acts of a third party who is not under the defendant's supervision or control unless the criminal conduct was the foreseeable result of the defendant's negligence. *LaFleur v. Astrodome–Astrohall Stadium Corp.,* 751 S.W.2d 563, 564 (Tex.App.—Houston [1st Dist.] 1988, no writ); *see also El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987) (third party's criminal act generally relieves negligent person from liability); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 550 (Tex. 1985) (same). A defendant has a duty to protect others from the criminal acts of a third party only if it reasonably appears or should appear to him that the criminal act would be the foreseeable result of his negligence. *El Chico Corp.,* 732 S.W.2d at 313–14; *LaFleur,* 751 S.W.2d at 564–65.

■ As a general rule, minors are civilly liable for their own torts. *Rodriguez,* 902 S.W.2d at 42. A parent may be liable if the parent negligently allows his child to act

in a manner likely to harm another, if he gives his child a dangerous instrumentality, or if he does not restrain a child known to have dangerous tendencies. *Id.* A parent's duty to protect third parties from his child's acts depends on whether the injury to the third party is foreseeable. *Id.* at 43. Foreseeability is evaluated by looking at the parent's knowledge of, consent to, or participation in the child's activity. *Id.*

Mike had a record of being a responsible, respectful, and well-behaved teenager. Duane testified that he did not know of any disobedience or discipline problems with Mike, and that Mike had never disobeyed the family's gun-safety rules in the past. Duane did not know that Mike had ever had alcoholic beverages. Duane testified that he taught Gabe about gun safety and that Gabe had always acted responsibly with guns in Duane's presence. Susan did not produce any evidence raising a fact issue as to whether Duane should have foreseen Mike's or Gabe's actions. Duane showed their acts were not foreseeable and that he was not negligent in supervising his son, the shotgun, or the ammunition.

We overrule Susan's claim that the trial court erred in granting a directed verdict in Duane's favor.

### D. Claims against Mike

 In issue number two, Susan argues the negative finding by the jury as to whether Mike's negligence, if any, proximately caused the shooting, is against the great weight and preponderance of the evidence. She also argues the evidence established Mike, not Gabe, was the shooter.

#### Standard of Review

In reviewing the factual sufficiency of the evidence, we examine all of the evidence. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied). After considering and weighing all of the evidence, we will set aside a jury verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence

that it is clearly wrong and unjust. *Pool,* 715 S.W.2d at 635; *Cain,* 709 S.W.2d at 176; *Hollander,* 853 S.W.2d at 726. We cannot substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Hollander,* 853 S.W.2d at 726. In this review, the Supreme Court has admonished the courts of appeals to be mindful that the preponderance of the evidence did not convince the jury. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988). Reversal is only warranted where the great weight of the evidence supports an affirmative answer. *Id.*

If we conclude the jury's finding was against the great weight and preponderance of the evidence, we must reverse the judgment of the trial court and remand the cause for a new trial. *Wright Way Spraying Serv. v. Butler,* 690 S.W.2d 897, 898 (Tex.1985).

#### Facts Regarding Mike's Liability

Susan testified that she received a phone call from her son Paul asking her to bring a wrench to the filling station because his friend's truck had broken down. As she spoke to him on the phone, she said a group of boys could be heard yelling in the background. Susan and her other sons (ages 12 and 13) left the house to take the wrench to Paul. On the way there, she saw two of Paul's friends, who asked her where she was going. When she told them, they decided to follow her.

Susan parked her car near the broken-down truck, off to the side of the filling station's car wash. Paul's friends pulled up to the gasoline pump to get gas. As they arrived, Paul was leaning over the hood working on the truck and his friend was underneath it. Susan went to the trunk of her car, opened it, and began looking for the wrench. About that time, she saw headlights of two vehicles pulling up, and she heard some boys yelling. Suddenly, she heard someone say, "They have a gun." Just before she was shot, she turned and saw a shotgun aimed at her by someone standing in the rear of the Bronco. She could not identify the shooter. The Bronco and the other vehicle then drove off. She said both groups

of boys were yelling back and forth before the shots were fired.

The police performed "anatomic absorption tests" to determine who had recently fired a gun, but the tests did not reveal the shooter. One of the police officers was under the impression that Mike, Gabe, and Danny smelled of alcoholic beverage, but no notes were made to that effect. Mike has blonde hair; Danny and Gabe both have dark hair. Three of four witnesses said the shooter was blonde.

Mike testified he, Danny, and Gabe pulled into the filling station and were talking to the girls from school when a boy with a shaved head, no shirt, and ripped shorts came over, yelling that he wanted to fight with them. The girls told Mike and his friends to leave because another boy was pacing back and forth nearby with a metal pole in his hands. Mike and his friends got back into the Bronco, and, as they drove away, exchanged words with the boy with the shaved head, Paul Prather.

Mike and his friends drove around until they saw Phillip Dagger and another friend from school, Levis Watson. Mike said Danny and Gabe got out of the car and talked to Phillip and Levis about the fight. In the meantime, Mike climbed from the back seat to the front seat to change the radio station. When Gabe and Danny came back to the Bronco, they said they wanted to go to a party. Mike testified that Danny drove the Bronco, Mike sat in the front passenger seat, Gabe sat in the back seat, and Phillip and Levis followed the Bronco in Phillip's truck.

Mike testified that as they drove by the filling station, Danny made a U-turn because he heard someone yelling at them from the station. Mike said as they pulled into the adjacent parking lot, Paul and four or five other boys started yelling and charging at the Bronco. Mike said he was watching Paul and his friends rush toward the Bronco when he heard the first shot. Danny slammed on the brakes and he and Mike ducked under the front dashboard because they did not know where the shots were coming from. Mike heard two more shots before he turned around and saw Gabe holding the shotgun. Mike was angry at Gabe and asked why he

had fired the shotgun. Gabe said he was afraid Paul and his friends were going to get into the Bronco, but that he had purposely fired away from people.

Danny drove away and took Gabe to his house. Danny and Mike testified that they insisted on Gabe taking the shotgun because he had fired the shots. On the way to Danny's house, Mike and Danny threw some shotgun shells, both spent and unfired, in a drainage ditch. Danny and Mike eventually turned themselves in to the police.

Mike admitted he, Danny, and Gabe had been drinking beer earlier in the evening, although he denied it when Duane asked. He admitted drinking and having the shotgun and the shells in the vehicle that night were direct violations of his father's instructions. He stated he meant to leave the shotgun in the Bronco after his trip to the farm because he thought he and Duane would be going back out to the farm on Friday. He said he knew the gun and shells were in the truck, but he forgot about them because he put the gun under the back seat. He saw the gun under the seat when he sat in the back seat after they left the first confrontation. He admitted it occurred to him to bring the gun home, but he deliberately chose not to. Mike said the shotgun was not loaded when it was left in the Bronco after the fishing trip. He did not know when or by whom it was loaded, but said he did not do it.

Mike admitted yelling and swearing at Paul and his friends during the first argument and said it was a stupid thing to do. Mike did not remember whether he asked Phillip and Levis to find and fight with Paul and his friends. At the time of the shooting, Mike did not know Gabe was manic-depressive or taking lithium. Mike said he did not foresee and could not have foreseen that Gabe would load and fire the shotgun.

Danny testified that he, Mike, and Gabe had each drunk two or three beers earlier on the night of the shooting. He said the shotgun was unloaded and under the back seat. He testified they left the station when someone starting shouting at them as they talked to the girls from school. He said after they

talked with Phillip and left for the party, he drove, Mike sat in the passenger's seat, and Gabe sat in the back seat.

As the boys drove by the filling station after talking to Phillip, Danny heard someone yelling at them. He turned around and entered the adjacent Firestone parking lot, then saw six to 10 people yelling and running toward the Bronco. He tried to leave, but the driveway was blocked by Phillip's truck. When he heard the first gunshot, he ducked and did not know where the shots were coming from. He never heard the gun being loaded, but said it was loud in the Bronco because the top was off and the radio was on. Danny said he did not know or anticipate that anyone would fire the shotgun from the Bronco. Danny said Mike had nothing to do with the shooting.

Mike's friend, Phillip, testified he was sitting in his car in the Randall's parking lot, waiting to pick up a friend after work, when the Bronco drove up. He said the three boys told him about the confrontation at the filling station and asked him and Levis to help them go back for a fight. Phillip said he followed the Bronco to the filling station and saw Mike, not Gabe, sitting in the back. He did not see who fired the shots. Phillip thought Mike was intoxicated. Phillip testified the purpose of going to the Firestone lot was to fight the other boys. He described the three boys in the Bronco as "real hyper like adrenaline rushing real bad. Like, ready to get in a big brawl and stuff. I mean, they were pretty going there [sic]."

In his statement to the police, Gabe said he remembered picking up and pointing the shotgun, and seeing fire come from the gun. He did not remember loading or pumping the gun or pulling the trigger. Before the shooting, he was diagnosed as manic-depressive and had suffered blackouts. At the time of the shooting, he was taking lithium.

One of the girls at the filling station testified that two boys she did not know came up behind her car and started yelling while she talked with Gabe. She said one of the strangers had a metal pole in his hand and was banging it on the ground. Gabe told her to leave. She was surprised when Gabe later told her he had done the shooting.

*Analysis*

Susan argues the evidence proved Mike, not Gabe, was the shooter. We disagree. Mike has blonde hair, three of four witnesses said the shooter was blonde, and Phillip saw Mike in the back seat of the Bronco, not Gabe. However, the shooting occurred at night, in a short amount of time, and some distance from the witnesses. Mike and Danny both testified that Gabe was the shooter and that Mike was sitting in the front seat. Mike testified that he climbed from the back seat to the front seat to change the radio station when Danny and Gabe were talking to their friends. Gabe confessed to and was convicted of the shooting. One of the girls testified that Gabe told her he had done it.

The evidence does not show that Mike, instead of Gabe, did the shooting. We overrule Susan's claim that the evidence showed Mike was the shooter.

■ Alternatively, Susan argues the jury's finding that Mike's negligence, if any, did not proximately cause her injuries is against the great weight and preponderance of the evidence. We disagree.

As noted above, there is no general duty to protect the public from an independent third party's criminal acts unless the criminal conduct is the foreseeable result of a defendant's negligence. *LaFleur*, 751 S.W.2d at 564. If the defendant's negligence makes the crime foreseeable, the defendant may have a duty to protect others. *Id.* at 564–65.

Mike testified he did not foresee that Gabe would find the shotgun, find the ammunition, load the gun, and fire it at anyone. He said the fact that the shooting happened was still unbelievable two years later. Danny did not know or anticipate that Gabe would fire the shotgun. One of the girls Mike and his friends saw that night was surprised that Gabe fired the gun. Duane was also surprised because he had taught Gabe about gun safety and Gabe had always been careful around Duane.

Having viewed all of the evidence, we hold that the jury's finding is not so against the

great weight and preponderance of the evidence as to be clearly wrong and unjust.

We overrule Susan's claim that the evidence was factually insufficient to support the jury's finding that any negligence, if any, on Mike's part was not a proximate cause of her injuries.

### E. Error in the Jury Charge

In issue number three, Susan argues the trial court erred in refusing to include her requested definitions in the jury charge and in not submitting the case to the jury on strict liability as to gun ownership, possession, and usage. As discussed above, strict liability was properly denied, and we need only consider whether the trial court erred in refusing to submit to the jury definitions of "negligence" and "degree of care" couched in terms of a high degree of care.

#### Standard of Review

We review the trial court's refusal to include requested definitions in the jury charge for an abuse of discretion, which occurs only when the trial court acts arbitrarily or without reference to any guiding principle. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Harris County v. Demny*, 886 S.W.2d 330, 332 (Tex.App.—Houston [1st Dist.] 1994, writ denied). A party is entitled to a jury question, instruction, or definition if the issue is raised by the pleadings and the evidence. Tex.R.Civ.P. 278. To determine whether an alleged error in the jury charge is reversible, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). Error in the charge is reversible only if harmful, that is, if it caused or was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *Id.*; *Demny*, 886 S.W.2d at 332; Tex.R.App.P. 44.1(a)(1).

Rule 277 of the Texas Rules of Civil Procedure requires the trial court to submit such definitions as necessary to enable the jury to reach a verdict. *St. James Transp. Co. v. Porter*, 840 S.W.2d 658, 664 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The trial court has wide discretion to provide explanatory definitions necessary to enable the jury to render a verdict. *Demny*, 886 S.W.2d at 332. Although the trial court must explain to the jury the legal or technical terms in the charge, the court has wide discretion to determine the sufficiency of the explanations. *Porter*, 840 S.W.2d at 664.

#### Analysis

Susan requested that the charge include the following definitions:

"Negligence" means failure to use a high degree of care, that is failing to do that which a very cautious, competent, and prudent person would have done under the same or similar circumstances or doing that which a very cautious, competent, and prudent person would not have done under the same or similar circumstances.

"High degree of care" means that degree of care that would have been used by a very cautious, competent, and prudent person under the same or similar circumstances.

Alternatively, Susan asked for the following definitions to be included in a jury charge discussing ordinary care:

"Ordinary care" means that degree of care which is proportionate to and commensurate with the dangers involved that would be used by a person of ordinary prudence under the same or similar circumstances.

The charge given to the jury read as follows:

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

The charge given to the jury tracks the language in Texas Pattern Jury Charge 2.1. 2 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 2.1 (1996). The explanation

accompanying the pattern charge is that these definitions should be included in a jury charge whenever ordinary negligence is the standard of care. *Id.* Susan's proposed charge tracked the language of PJC 2.2, the explanation of which says a high degree of care is called for in cases involving the duties of common carriers to their passengers or handlers of dangerous commodities. 2 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 2.2 (1996); *see also Robert R. Walker, Inc. v. Burgdorf,* 150 Tex. 603, 244 S.W.2d 506, 509 (Tex.1951) (those who handle explosives, combustible gases, gasoline, petroleum, electricity, and similar dangerous commodities are held to a high degree of care).

There are few cases in Texas concerning the application of a high degree of care to a negligence cause of action. The courts tend to hold the definition on ordinary care is sufficient for the vast majority of negligence cases. *See Wendell v. Central Power & Light Co.,* 677 S.W.2d 610, 620 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.) (common-law meaning of "ordinary care" is elastic enough to meet all emergencies and requires a person to act as a person of ordinary prudence would under similar circumstances); *Winborn v. Mayo,* 434 S.W.2d 207, 208 (Tex.Civ.App.—San Antonio 1968, no writ) (modern trend is to apply general rules of negligence where injury inflicted by firearm; reasonable care applied to persons using firearms is care proportionate to the probability of injury); *see also Anderson v. Market St. Developers, Ltd.,* 944 S.W.2d 776, 779 n. 1 (Tex.App.—Eastland 1997, writ denied) (ordinary care is elastic enough to meet all emergencies, and amount of care varies depending on circumstances).

Susan does not cite to any Texas cases where a high degree of care has been applied to a case involving a firearm. The definition the jury received included an instruction to consider what an ordinarily prudent person would do in similar circumstances when faced with similar dangers to other people. We hold the trial court did not abuse its discretion in submitting a definition of ordinary negligence in the jury charge and denying Susan's proposed definition on high degree of care.

We overrule Susan's claim that the trial court erred in rejecting her proposed jury charge definitions.

We affirm the trial court's judgment.