

WITHDRAWN 10-12-11
REISSUED 10-12-11

# IN THE
# TENTH COURT OF APPEALS

─────────────

### No. 10-11-00089-CV

─────────────

**BEN L. RICHARDSON, SR. AND
MELBA RICHARDSON, INDIVIDUALLY
AND AS SURVIVING HEIRS OF JOHN
KENNEDY RICHARDSON AND AS NEXT
FRIENDS OF MINOR CHILDREN,
SARAH RICHARDSON, JOHN RICHARDSON,
AND JOSHUA RICHARDSON; SUNSHINE
RICHARDSON, INDIVIDUALLY AND AS SURVIVING,**

$\qquad$ **Appellants**

 **v.**

**MICHAEL LEE CRAWFORD,**

$\qquad$ **Appellee**

─────────────

### From the 414th District Court
### McLennan County, Texas
### Trial Court No. 2007-2176-5

─────────────

## MEMORANDUM OPINION

─────────────

Appellants, Ben L. Richardson, Melba Richardson, Sarah Richardson, John

Richardson, Joshua Richardson, Sunshine Richardson, Katelyn Richardson, and the

estate of John Kennedy Richardson, complain about a summary judgment order in

favor of appellee, Michael Lee Crawford. In three issues, appellants argue that the trial court erred in: (1) granting summary judgment in favor of appellee because material fact issues existed as to their negligent entrustment and negligent storage claims; and (2) overruling objections to third-party testimony regarding "(a) the killer's intent to steal the handgun, and (b) the intent to kill [the deceased]." We affirm.

## I. BACKGROUND

This appeal stems from the murder of John Kennedy Richardson on June 5, 2005, by his wife, Gretchen Williams Richardson. Gretchen admitted to shooting John on a Waco highway during the early morning hours of June 5, 2005, with a .38 Smith & Wesson snub-nose, five-shot revolver that was owned by appellee.

Gretchen and appellee both worked as real estate agents at Stewart R. Kelly Real Estate, Inc. d/b/a Kelly, Realtors ("Kelly Realtors"), a local company specializing in real estate transactions. By all accounts, Gretchen and appellee were friends. Gretchen, however, did not get along with many of her co-workers, and in fact, many of her co-workers alleged that they were scared of how manipulative, vindictive, hateful, and intimidating Gretchen could be.[1] Appellee testified that he did not see that side of Gretchen. He and Gretchen often had lunch together and shared "off-color" jokes via email. Despite rumors to the contrary, appellee denied that he had an affair with Gretchen, though several of Gretchen's colleagues provided statements to police

---

[1] One of Gretchen's colleagues recalled an instance where Gretchen "forked" someone's yard. "Forking" apparently involves the concealing of forks in the ground with the prongs up so that anyone who walks across the yard will be injured by the spikes. In addition, several colleagues recalled that Gretchen yelled at John on the phone and often stated that she hated him. However, no evidence in the record indicates that appellee was aware of these incidents.

indicating that Gretchen boasted of having affairs with several men, including several at the Kelly Realtors office. Appellee claimed that Gretchen told him that she was unhappy with her marriage, but she never indicated that she intended to kill her husband. Appellee recommended that Gretchen seek a divorce.

Gretchen testified that her downward spiral began in January 2005, when she became depressed during recovery from a hysterectomy. At that time, Gretchen began abusing prescription pain pills and staying out during all hours of the night. Several of Gretchen's colleagues observed her asleep at her desk when they arrived at work early in the morning. Gretchen acknowledged that she continually worked to obtain more prescription pain pills through doctors and other sources.

When Gretchen arrived home just before midnight on June 4, 2005, John confronted Gretchen about her drug abuse. Gretchen had been drinking alcohol that night, and she had taken some Ambien and five to eight Hydrocodone pills. John told Gretchen that he had informed the doctors who had prescribed the pills about her drug abuse and requested that they no longer prescribe medications to Gretchen. Enraged, Gretchen verbally and physically fought with John until he let her leave the house. Gretchen was intent on showing John that he could not stop her from procuring drugs whenever she wanted.

After leaving the house, Gretchen went to the Kelly Realtors office. When she arrived at the office, it was dark, as it was shortly after midnight on June 5th. Gretchen recalled that appellee left a loaded gun in his desk drawer, which was intended to be used by women in the office who either came in early or stayed late and were without a

male escort. Appellee testified that the Compass Bank building next door had recently been robbed; he believed that the women in the office could use the protection. Gretchen stated that appellee told the women of the office that they could also take the gun with them for protection when showing properties to suspicious people or in bad parts of town. Gretchen recalled that she took the gun to show properties on four or five different occasions. Appellee, however, denied that the women had permission to take the gun off the premises of the office. Nevertheless, when Gretchen arrived at the office on June 5th, she went to appellee's office, opened his desk drawer, moved to the side the tray that was concealing the gun, and took the gun with her. Gretchen noted that she called John after she left the office, but he answered the phone angry and asked several questions.[2]

Gretchen left the office and went to an apartment complex in Robinson, Texas, to buy drugs. She alleged that it was her intent to use the gun taken from appellee's desk for protection during the drug deal, not for the showing of properties. She bought $400 worth of drugs, which, as Gretchen noted, may have included methamphetamines.

According to Gretchen, as she was driving on Loop 340 towards her home in Lorena, Texas, she realized that John was flashing the lights of his truck while driving behind her. They both pulled over to the side of the road and stopped their vehicles. Gretchen believed that John had followed her to witness the purchase of the drugs, which "really put [her] in a state." John got out of his truck and approached Gretchen.

---

[2] Gretchen initially testified that she pulled into a strip mall located on Franklin Avenue to call John from a pay phone, though she had her cell phone in the car. However, she could not recall exactly where the telephone call was made, and she acknowledged that police "[p]robably" discovered when the phone call was made by "tracing through cell phone records."

Appellee's gun sat in Gretchen's lap, wrapped in a T-shirt. John yelled at Gretchen as he approached, and after she exited the vehicle, she yelled "Just shut up!" while firing a warning shot into the air. John continued to argue with Gretchen and instructed her to stay away from the couple's children. Gretchen then shot John several times, including once in the leg and twice in the back. Gretchen alleged that she only recalled shooting John in the leg and that her next memory was of John's head in her lap when the police arrived. She did remember, however, panicking about the drugs and trying to plant them on John so that she would not be charged with drug possession. John died as a result of the gunshot wounds inflicted by Gretchen.

When first questioned by police about the incident, Gretchen blamed an unknown African-American male for the shooting and claimed that it was a drug deal that had gone bad. She later admitted to shooting John and subsequently pleaded guilty to the murder of John, which resulted in a forty-year prison sentence for her.

On June 6, 2007, appellants filed their original petition against appellee and defendants, Kelly Realtors, Stewart Ragan Kelly, and Trammell Reid Kelly, asserting wrongful death and survival claims based upon theories of negligent entrustment and "negligent storage of a dangerous instrumentality."[3] Appellee filed a general denial, denying all of the allegations contained in appellants' original petition, and a motion to designate Gretchen as a responsible third party—a motion which the trial court granted.

---

[3] In their first amended petition, appellants dropped all of their claims against all defendants except appellee.

Appellee later filed a traditional motion for summary judgment, arguing that issues of material fact did not exist as to appellants' causes of action. Appellants filed a response to appellee's summary judgment motion, which included, among other things, the full deposition testimony of appellee; Gretchen; Stewart; Trammell; and Tracy A. O'Connor, a Lieutenant with the Robinson Police Department who investigated this incident; various written statements given by Gretchen's colleagues at Kelly Realtors; and documents pertaining to handgun safety and the procurement of a concealed handgun license.

Appellee filed objections to appellants' summary judgment evidence, all of which were denied by the trial court except for:

> the purported testimony of Gretchen Richardson, to the extent that it is utilized in a manner contrary to her guilty plea to first[-]degree murder, which includes both the intent to commit homicide, as well as a denial of any lack of capacity, with respect to pages 68-69 of the Gretchen Richardson deposition, Exhibit 1.[4]

The trial court subsequently granted appellee's motion for summary judgment and ordered that appellants take nothing from appellee. This appeal followed.

## II. NEGLIGENT ENTRUSTMENT & NEGLIGENT STORAGE OF A FIREARM

In their first issue, appellants argue that Texas courts recognize the tort claim of negligent entrustment of a firearm and that the trial court erred in concluding that no material fact issue existed as to the elements of appellants' negligent entrustment claim. In their second issue, appellants contend that, even if Gretchen's use of appellee's gun

---

[4] On pages 68-69 of her deposition, Gretchen testified that she "definitely didn't" intentionally and knowingly kill John. This testimony contradicted her previously-entered guilty plea, and as such, the trial court sustained appellee's objection to this testimony.

was unauthorized, Texas courts should recognize a claim for negligent storage of a firearm and that material fact issues exist as to that claim.

## A. Standard of Review

We review the grant or denial of a traditional summary judgment de novo. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 n.7 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003). A movant is entitled to summary judgment if he demonstrates that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *see also Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The movant bears the burden of proof in a traditional motion for summary judgment, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

We will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved its defense as matter of law or if the movant has negated at least one essential element of the plaintiff's cause of action. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005); *see Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). Only when the movant has

produced sufficient evidence to establish its right to summary judgment does the burden shift to the non-movant to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

## B. Applicable Law

At the outset of our analysis of appellants' contentions, we note that this Court has not recognized a cause of action for negligent entrustment of a firearm. A few other Texas courts, however, have recognized a cause of action for negligent entrustment of a firearm. *See Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Kennedy v. Baird*, 682 S.W.2d 377, 378-79 (Tex. App.—El Paso 1984, no writ). In recognizing this cause of the action, the courts have analogized negligent entrustment of a firearm to negligent entrustment of an automobile. *See Prather*, 981 S.W.2d at 806; *see also Kennedy*, 682 S.W.2d at 378-79.

The Second Restatement of Torts provides that a person who gives a chattel to another, knowing the other person, due to youth, inexperience, or other factors, is likely to use the chattel in a manner involving unreasonable risk of harm to himself or others, may be held liable for harm caused by the use of the chattel. RESTATEMENT (SECOND) OF TORTS § 390 (1965); *see Prather*, 981 S.W.2d at 806 (citing *Rodriguez v. Spencer*, 902 S.W.2d 37, 42 (Tex. App.—Houston [1st Dist.] 1995, no writ)).

To establish negligent entrustment of an automobile, a plaintiff must prove the following elements: (1) the owner entrusted the automobile (2) to a person who was an incompetent or reckless driver (3) who the owner knew or should have known was

incompetent or reckless; (4) the driver was negligent; and (5) the driver's negligence proximately caused the accident and the plaintiff's injuries. *Prather*, 981 S.W.2d at 806; *see Mayes*, 236 S.W.3d at 758.

## C. Negligent Entrustment

Though we have not specifically recognized a cause of action for negligent entrustment of a firearm, even if we were to apply the negligent entrustment factors articulated in *Prather* and *Mayes*, we cannot say that appellants' summary judgment evidence raises a genuine issue of material fact so as to preclude summary judgment.[5] *See Prather*, 981 S.W.2d at 806; *see also Mayes*, 236 S.W.3d at 758.

In his motion for summary judgment, appellee asserted that: (1) he had no legal duty to prevent unforeseeable criminal acts; (2) the evidence did not establish that he could have foreseen Gretchen's intentional act of murdering John; (3) appellants' negligent entrustment claim must fail because there is no evidence that he knew that Gretchen was incompetent or reckless in handling guns and because Gretchen engaged in an intentional act using the gun; and (4) Gretchen's criminal act is a superseding cause breaking the causation chain.

In her deposition testimony, Gretchen admitted that it was not foreseeable to anyone at Kelly Realtors that she would kill John. She did testify that she was depressed and abusing drugs, but she hid that from her colleagues at the office, though she described herself as a "walking time bomb." She also admitted that John kept

---

[5] Though we analyze the merits of appellants' first issue, this should not be interpreted to mean that we recognize "negligent entrustment" to include personal property, in general, or of a firearm, in particular, as a cause of action.

several guns around the house and that a couple of them were left unsecured underneath their bed or in a closet. When asked whether she knew how to use a gun "enough to where you could shoot and kill your husband," Gretchen responded in the affirmative. She also recalled going to a gun range and learning how to shoot a gun when she was seventeen years old and that she had shot a rifle with her mother-in-law. Despite her experience with handling firearms, Gretchen did not believe that she was "fit or qualified to use a handgun for off-site self-defense protection."

Gretchen noted that she only told appellee that she had some family problems, but she did not "use him as a sounding board." She did not recall telling appellee about any violence or threats of violence in her home or about her drug use. She did, however, tell appellee about affairs that she was having. Gretchen recalled that she often joked with other colleagues at Kelly Realtors about killing John by poisoning his food[6]; however, there is no testimony establishing that she informed appellee of her intent to kill John. When Gretchen's trial counsel asked Gretchen whether she would have murdered John had appellee not provided the gun, she responded:

> We would have argued, and I would have driven off to my brother's house and probably stayed gone for a while, like I did other times. . . . If I hadn't had it with me, there would have been no way to kill him, and it was just an instant reaction, just anger and—you know.

Gretchen characterized the scope of appellee's permission to use the gun as follows:

---

[6] Lieutenant O'Connor stated that, based on his investigation, Gretchen's murder of John was premeditated and that, when she spoke to police at the scene of the incident, she was cold, callous, and "[n]oncaring." Lieutenant O'Connor did not believe that Gretchen handled the gun negligently or that the gun discharged accidentally. Furthermore, the fact that the gun was wrapped in a T-shirt led Lieutenant O'Connor to conclude that Gretchen sought to conceal the gun.

He had said if we were meeting a client that we were leery of, we could take it with us, or if—his preference was that clients would meet us at the office so that other people could see them and, you know, they would know that someone was aware that that's who we were going to be with, but if that wasn't the case and another male agent was not available, that we could use the gun.

Nevertheless, she took the gun for protection while she purchased drugs from a dealer at an apartment complex in Robinson. Lieutenant O'Connor described Gretchen's taking of the gun for that purpose as a theft.

Appellee stated that he had no knowledge of the shooting or that Gretchen intended to shoot John. At the time of the incident, appellee was on a cruise to Mexico with his wife. Appellee denied giving anyone permission to use the gun in the commission of a criminal act or to take the gun out of the office, though Gretchen was permitted to use the gun "[i]f she had an issue in the office." Appellee was unaware that Gretchen was abusing drugs or that she was depressed.

As a general rule, "a person has no legal duty to protect another from the criminal acts of a third person." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). But, in *Phan Son Van v. Pena*, the Texas Supreme Court noted that:

> The act of a third person in committing an intentional tort or crime *is a superseding cause* of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless* the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

990 S.W.2d 751, 753 (Tex. 1999) (emphasis in original); *see Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 550 (Tex. 1985) (holding that third-party criminal conduct is a

superseding cause unless the criminal conduct is a foreseeable result of such negligence).

> To impose liability on a defendant for negligence in failing to prevent the criminal conduct of another, the facts must show more than conduct that creates an opportunity to commit crime—they must show both that the defendant committed negligent acts and that it knew or should have known that, because of its acts, the crime (or one like it) might occur.

*Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 462 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see* RESTATEMENT (SECOND) OF TORTS § 448 (1965); *see also R.K. v. Ramirez*, 887 S.W.2d 836, 846 (Tex. 1994) (Enoch, J., dissenting) (noting that the essence of negligent entrustment is an awareness by the entrustor of the propensity of the actor to commit the *act* upon which the negligence claim is based).

"Foreseeability . . . requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). A danger is foreseeable if its general character might reasonably be anticipated, if not its precise manner. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). This determination involves a practical inquiry, based on common experience applied to human conduct, and asks whether the injury might reasonably have been contemplated as a result of the defendant's conduct. *Doe*, 907 S.W.2d at 478. Importantly, "[f]oreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Id.*

Here, Gretchen admitted that no one at Kelly Realtors, including appellee, could have foreseen that she intended to murder John. In addition, Gretchen stated that she

wore a "mask" at work to conceal her depression, drug abuse, and the problems she was allegedly having at home. Assuming without deciding that appellee was negligent in leaving the gun in his desk for others at the office to use, appellants have not tendered evidence demonstrating that appellee knew or should have known that Gretchen would use his gun to shoot John. In fact, Gretchen testified that she took the gun from appellee's desk to use for protection while she purchased drugs, which was also outside the scope of permission provided by appellee. Essentially, Gretchen used appellee's gun in the commission of two separate criminal acts. Though appellee was aware that Gretchen was not happy in her marriage to John, appellee had no knowledge that Gretchen intended to kill John. Rather, appellee suggested that Gretchen file for divorce. As such, we believe that Gretchen's intentional act of shooting John was unforeseeable and would constitute a superseding cause of harm which breaks the chain of causation. *See Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596-97 (Tex. 1987) (finding, in a negligent entrustment case, no proximate cause because the defendant's entrustment of a truck to a driver did not cause the accident, and the defendant's knowledge about the driver's record of speeding tickets did not lead it to foresee the accident resulting in injury)[7]; *see also Pena*, 990 S.W.2d at 753; *Doe*, 907 S.W.2d at 478; *Nixon*, 690 S.W.2d at 550; *Barton*, 276 S.W.3d at 462.

---

[7] Specifically, in *Schneider*, Esperanza Transmission Company, an oil-field pipeline company, provided a pick-up truck to one of its employees for business and personal use. 744 S.W.2d 595, 595 (Tex. 1987). The employee and a friend of his went to a dance one night. *Id.* Upon leaving the dance hall, the employee stated that he had drank too much and asked his friend to drive the pick-up truck. *Id.* The friend subsequently collided with the rear of a vehicle driven by Schneider. *Id.*

Because the summary judgment record conclusively negates the proximate causation element of appellants' negligent entrustment cause of action, we cannot say that the trial court erred in granting summary judgment in appellee's favor. *See Mason*, 143 S.W.3d at 798; *Grinnell*, 951 S.W.2d at 425; *see also Mayes*, 236 S.W.3d at 758; *Prather*, 981 S.W.2d at 806. And, as a secondary ground supporting the trial court's summary judgment order, we note that the summary judgment record demonstrates that Gretchen has experience handling firearms, though she does not have a license to carry a firearm; her house contained several unsecured firearms; that she hid her alleged emotional instability from her colleagues; and that appellee did not have any inkling that Gretchen was mentally unstable or lacked experience handling firearms; thus, the record conclusively negates the reckless or incompetent element of appellants' negligent entrustment claim. *See Mayes*, 236 S.W.3d at 758; *Prather*, 981 S.W.2d at 806; *see also Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 571 (Tex. 1985) ("[W]hether a driver has a license does not determine whether a driver is, *in fact*, incompetent.") (emphasis in original); *Robson v. Gilbreath*, 267 S.W.3d 401, 406 (Tex. App.—Austin 2008, pet. denied) (stating that mere involvement in an accident does not create an inference or conclusion that a driver is incompetent or reckless, and evidence that a driver is inexperienced, without more, does not permit an inference that a driver lacked judgment or perception or was otherwise an incompetent driver). Based on the foregoing, we overrule appellants' first issue.

## D. Negligent Storage

With respect to their second issue, appellants acknowledge that no Texas court has recognized an independent cause of action for negligent storage of a firearm. Nevertheless, appellants direct us to cases from several other states where such a claim purportedly exists. *See, e.g., Jupin v. Kask*, 849 N.E.2d 829, 842 (Mass. 2006); *Gallera v. Koskovich*, 836 A.2d 840, 851 (N.J. 2003); *Heck v. Stoffer*, 786 N.E.2d 265, 271 (Ind. 2003); *see also* Andrew J. McClurg, *Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms*, 32 CONN. L. REV. 1189 (2000). While the authority cited by appellants from other state courts constitutes persuasive authority, none of it is binding on this Court. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (stating that opinions from any federal or state court may be relied on a persuasive authority, but Texas appellate courts are obligated to follow only higher Texas courts and the United States Supreme Court). Given that neither the Texas Supreme Court nor our sister courts in Texas have recognized a claim for negligent storage of a firearm, we decline to do so at this time.[8] Accordingly, we overrule appellants' second issue.

---

[8] It is also noteworthy to mention that one Texas court declined to hold a gun store liable with regard to a complaint that is similar to the negligent-storage contention made here. *See Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 269 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In *Ambrosio*, a Smith & Wesson handgun was stolen from an unlocked display case at a gun store by a customer when the store attendants were helping other customers. *Id.* at 264. Subsequently, the stolen gun was sold to another, who used the gun in several violent crimes, including the murder of a man during a carjacking. *Id.* The family of the man killed during the carjacking filed suit against the gun store for negligence, negligence per se, strict liability, and gross negligence. *Id.* at 263. Specifically, appellants asserted that "appellee violated its duty to exercise care in the storage and display of its firearms" and that the violation of this duty caused the death of Alek Ambrosio. *Id.* Appellants also argued that appellee's lax security previously resulted in thefts of other guns from the store. *Id.* at 269. The *Ambrosio* court held that summary judgment was proper because "appellee's failure to exercise care in the storage

### III. GRETCHEN'S THIRD-PARTY TESTIMONY

Though appellants list, in their issues presented, a third issue pertaining to the trial court's overruling of their objections to Gretchen's third-party testimony regarding her intent to steal appellee's gun and her intent to kill John, appellants do not provide any argument or authority in support of this issue. As a result, we conclude that this issue has been inadequately briefed and, therefore, waived. *See* TEX. R. APP. P. 38.1(i) (providing that a "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). We overrule appellants' third issue.

### IV. CONCLUSION

Having overruled all of appellants' issues, we affirm the judgment of the trial court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed August 17, 2011
[CV06]

---

and display of its firearms is too remote and attenuated from the criminal conduct of the . . . car[]jackers to constitute a legal cause of injury to either Alek Ambrosio or his parents." *Id.* at 266.