**Opinion filed March 26, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00058-CV

_____

**BULAH MARIE GARRETT, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF LYNDELL RAY GARRETT, DECEASED; LISA GARRETT; AND SHELLY GARRETT, Appellants**

**V.**

**WAL-MART STORES TEXAS, LLC D/B/A WAL-MART SUPERCENTER #561 AND GREYHOUND LINES, INC., Appellees**

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. CV2045855**

### O P I N I O N

This appeal arises from a tragic incident where a mentally ill man that had been kicked off of a Greyhound bus murdered a random customer at the Wal-Mart

in Eastland. Appellants are Bulah Marie Garrett, individually and as representative of the estate of Lyndell Ray Garrett; Lisa Garrett; and Shelly Garrett (the Garretts). Appellees are Wal-Mart Stores Texas, LLC d/b/a Wal-Mart Supercenter #561 (Wal-Mart) and Greyhound Lines, Inc. (Greyhound). The trial court granted the motions for summary judgment filed by Greyhound and Wal-Mart.

On appeal, the Garretts challenge the trial court's summary judgment orders, asserting that the trial court erred when it found that Wal-Mart and Greyhound did not owe a duty of care to the decedent and that their actions were not a proximate cause of the incident. We affirm.

*Factual and Procedural Background*

On March 7, 2019, Brad Wilson boarded a Greyhound bus in Dallas that was bound for Midland. The driver of the bus was Wayne Owens.

After the bus left the terminal, Wilson began talking to himself and blurting out noises. Deandre Woods, one of the passengers on the bus, stated by affidavit that "[a]s the trip went on, [Wilson] became more aggressive and started kicking seats and windows." Furthermore, "[h]e wouldn't stop even when [Owens] asked him to calm down."

Eventually, Owens pulled over at a convenience store in Eastland, and "let [Wilson] off [of the bus] out there." In that regard, Owens testified that Wilson wanted to get off the bus and that he let him once Owens could get off of the interstate. Owens testified that he did this because it seemed to him that Wilson was having a mental disturbance or that he was "on drugs or something like that," and that he was concerned for the safety of his passengers.[1] In his affidavit, Woods stated that he was "glad that happened before someone got hurt."

---

[1]The Garretts contend that Wilson is a diagnosed schizophrenic.

2

According to Alan Smith, the Director of Safety for Greyhound, a driver has no general obligation to notify the corporate office or law enforcement when a passenger gets off the bus before the passenger's scheduled destination. However, when a driver regards a passenger as a threat "because of his dangerous or erratic behavior," the driver is responsible for notifying local authorities after removing the passenger from the bus.

Owens testified that, after he let Wilson off the bus, he believed that there was "[p]robably a good possibility" that he might go hurt someone. Likewise, in his affidavit, Woods stated that it was not "totally surprising" for him to learn that Wilson had later stabbed someone to death. Woods recounted that, at one point, he had "opened [his] eyes to see [Wilson] glaring" at him, and that he "had a strong sense that [Wilson] wanted to hurt [him]." However, Woods also added that his perception of the threat posed by Wilson was difficult to describe. He indicated that "[y]ou would have to be there and see the look in his eyes to fully understand it and appreciate how threatening he seemed."

However, Owens took no steps to notify Greyhound headquarters or local law enforcement regarding the threat of violence posed by Wilson. Owens testified that, at the time of the incident, he was behind schedule, and his passengers were going to have to wait in Abilene for "24 hours or something like that" if they didn't make their connection. He further testified that, if he called the police, it was going to take additional time and that he would have "[l]ost at least maybe 45 minutes to an hour or something like that."

There is evidence that, after Wilson exited the bus, he went to the local Wal-Mart store, where he received a money transfer for $100. The money transfer was processed by Jeannie Christian, a Wal-Mart assistant manager. Christian testified that she "[j]ust . . . didn't like" Wilson and that there was something about Wilson

3

"that wasn't right." However, she added that "[h]e was just an odd sort . . . [and] there [are] other odd people that come in there."

Surveillance footage from Wal-Mart shows that, a few minutes after he acquired the money, Wilson approached a register in an attempt to purchase several items. However, before the transaction was complete, he ran back to the service desk and yelled at Christian, accusing her of keeping his photo ID after the money transfer. Christian then informed Wilson that the ID was in his wallet, and Wilson returned to the register to purchase the items, including a three-inch folding pocketknife that would later become the murder weapon. There is evidence that, at the same time Wilson purchased the pocketknife, he also purchased two six-packs of beer.

Police reports by officers with the Eastland Police Department indicate that over the next one and one-half hours, Wilson was on and off of the property, leaving at least two times. He eventually returned to the property at 3:05 p.m., at which point he plugged his phone into a charger in an outlet beside a vending machine located outside of the store. Surveillance footage shows that, during this time, Wilson appeared to watch or follow at least two customers before returning to the location beside the vending machine.

Carla Hill was one of the customers that was approached by Wilson. At the time, Hill was at the store with her husband, who had Alzheimer's disease and was 90% blind. After she and her husband got out of their vehicle, Wilson came up to them and spoke to them, but Hill "did not understand what he said." Hill testified that she "could tell that something wasn't quite right with [Wilson]." She then put her husband back into the vehicle and locked the door before heading into the store. There, she reported his presence to Linda Young, a Wal-Mart employee who was working in the self-checkout lane. She told Young about her encounter with Wilson

4

and advised that they should send at least two men out to speak to him, because of her fear that he might harm anyone trying to approach him. However, the record does not indicate that Hill reported that Wilson was harming or threatening to harm anyone. Rather, she merely expressed a concern that Wilson might pose a risk based on her belief that "something wasn't quite right with him."

In an affidavit, Young generally confirmed the events that were described by Hill. However, she testified that she was prohibited from leaving the register and that she had no means of immediately communicating Hill's report to management.

The Garretts do not point to any evidence indicating that Wal-Mart employees were aware of Wilson's erratic conduct outside of the store based on direct observations. Instead, the record indicates that Wal-Mart's knowledge was based on the indirect information that had been provided by Hill. Furthermore, the Garretts do not point to any evidence indicating that Wilson had previously engaged in violent conduct outside of the store, nor do they indicate that such violent conduct had been observed by or reported to Wal-Mart employees.

It is undisputed that, shortly after Hill reported Wilson's conduct to Young, Wilson assaulted and killed Lyndell Garrett with the pocketknife that he had purchased earlier in the day.

The Garretts filed suit against Greyhound and Wal-Mart, alleging causes of action for negligence and gross negligence. Thereafter, they filed their first amended petition, alleging the same causes of action. In their first amended petition, the Garretts claimed that, as a common carrier, Greyhound "owed the highest level of care to its passengers and the public." They also claimed that Greyhound "violated its ordinary duty to exercise ordinary care, as well as its duty as a common carrier" and that it failed in such duty by "[r]emoving Wilson . . . in a strange city without calling for support from mental health services or law enforcement officials."

5

Wal-Mart and Greyhound filed motions for summary judgment. Greyhound's motion was initially denied. However, the trial court granted Wal-Mart's motion and signed a take-nothing judgment in favor of Wal-Mart. Greyhound then filed a motion for reconsideration. The trial court set a hearing on Greyhound's motion for reconsideration for January 22, 2024. On January 19, 2024, the Garretts filed their second amended petition, which included a new allegation stating that Greyhound was negligent in "undertaking the care and transportation of [a] passenger and then discharging such undertaking in a negligent manner." The hearing on Greyhound's motion proceeded on January 22, as scheduled, and the trial court granted Greyhound's motion for summary judgment. This appeal followed.

*Analysis*

In two issues, the Garretts assert that the trial court erred in granting the motions for summary judgment filed by Greyhound and Wal-Mart. Wal-Mart and Greyhound sought summary judgment on both traditional and no-evidence grounds.

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c);[2] *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their

---

[2]We note that the Texas Supreme Court has recently revised Rule 166a. Although the "rewrite is not intended to substantively change the law," it has resulted in a renumbering of the provisions of the rule. *See* Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure, Misc. Docket No. 26-9012 (Tex. Feb. 27, 2026). The amendments to this rule only apply to motions for summary judgment filed on or after March 1, 2026. Because the motions for summary judgment in this case were filed prior to that date, we refer to the rule in effect at the time the motions were filed. *See id.*

conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).

"A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003); *Heirs of Del Real v. Eason*, 374 S.W.3d 483, 486 (Tex. App.—Eastland 2012, no pet.). As such, we review the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *King Ranch*, 118 S.W.3d at 751.

"A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (citing Robert W. Calvert, "*No Evidence*" *and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). Thus, "a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact." *King Ranch*, 118 S.W.3d at 751; *Tex. Petrol. Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 840 (Tex. App.—Eastland 2022, no pet.). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch*, 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)); *McMillan*,

7

641 S.W.3d at 840. "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *King Ranch*, 118 S.W.3d at 751 (quoting *Havner*, 953 S.W.2d at 711); *McMillan*, 641 S.W.3d at 840. Ordinarily, when a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019).

Where, as here, the trial court's order does not specify the grounds relied upon, we must affirm summary judgment "if any of the summary judgment grounds are meritorious." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

*Negligence*

"The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Tenaris Bay City Inc. v. Ellisor*, 718 S.W.3d 193, 197 (Tex. 2025) (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013)).

"The threshold inquiry in a negligence case is duty." *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)). Whether a duty exists "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Id.* at 145 (quoting *Phillips*, 801 S.W.2d at 525).

Proximate cause requires proof of two elements: (1) cause in fact and (2) foreseeability. *Ellisor*, 718 S.W.3d at 197. "Cause in fact, in turn, also has two essential components: (1) 'but for' causation, and (2) 'substantial factor' causation." *Id.* (quoting *Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022)). Thus, a party's negligence is the cause-in-fact of an injury if (1) "without the act or

8

omission, the harm would not have occurred" ("but for" causation), and (2) "the negligence was a substantial factor in causing the injury" ("substantial factor" causation). *Thompson*, 649 S.W.3d at 158 (quoting *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex, 2018)).

"But for" causation simply means that, absent the allegedly negligent act or omission, "the harm would not have occurred." *Rogers v. Zanetti*, 518 S.W.3d 394, 403 (Tex. 2017) (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

"[T]he substantial-factor inquiry incorporates 'the idea of responsibility' into the question of proximate cause." *Werner Enters., Inc. v. Blake*, 719 S.W.3d 525, 537 (Tex. 2025) (quoting *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991)). It "is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense." *Lear Siegler*, 819 S.W.2d at 472 (quoting RESTATEMENT (SECOND) OF TORTS § 431, cmt. a (A.L.I. 1965)). As such, "[l]iability does not fall on . . . participants . . . whose actions merely 'created the condition which made the injury possible.'" *Werner*, 719 S.W.3d at 528 (quoting *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 803 (Tex. 2004)).

"Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985). However, once an actor has created a dangerous situation, foreseeability does not require that the actor anticipate the "precise manner in which injury will occur." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

Generally, the criminal conduct of a third party is considered to be a "superseding cause" that relieves a defendant of liability. *El Chico Corp. v. Poole*,

9

732 S.W.2d 306, 313 (Tex. 1987). However, the defendant's negligence "is not superseded and will not be excused when the criminal conduct is a foreseeable result" of such negligence. *Travis*, 830 S.W.2d at 98; *Poole*, 732 S.W.2d at 314.

*Greyhound's Motion for Summary Judgment*

Greyhound sought summary judgment on both traditional and no-evidence grounds on the issues of duty and proximate cause.

A. *Duty*

The Garretts assert that Greyhound owed a duty of care to Lyndell based on two independent theories. First, they argue that Greyhound was under a duty to control the conduct of Wilson based on its responsibilities as a common carrier. Second, they contend that, in undertaking to remove Wilson from the bus, Greyhound assumed a duty to Lyndell to protect him from Wilson's actions.[3]

1. *Greyhound's Duties as a Common Carrier*

"Generally, there is no duty to control the conduct of third persons." *Phillips*, 801 S.W.2d at 525. However, the Garretts assert that Greyhound owed a duty of care to Lyndell based on a special relationship between Greyhound and Wilson. *See Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002) (The general rule "does not apply when a special relationship exists between an actor and another that imposes upon the actor a duty to control the other's conduct."); *Phillips*, 801 S.W.2d at 525 (first citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); and then citing RESTATEMENT (SECOND) OF TORTS § 315(a) (A.L.I. 1965)).

The supreme court's holdings on this question rely in part on Section 315(a) on the Restatement (Second) of Torts, which provides that "[t]here is no duty . . . to control the conduct of a third person as to prevent him from causing physical harm

---

[3]In their pleadings, the Garretts also asserted that Greyhound owed a duty to Lyndell based on its "ordinary duty to exercise ordinary care." However, they do not make this argument on appeal.

to another unless . . . a special relation exists between the actor and the third person which imposes a duty upon the actor." RESTATEMENT (SECOND) OF TORTS § 315(a) (A.L.I. 1965); *Otis*, 668 S.W.2d at 309. The Restatement then indicates that "[t]he relations between the actor and a third person which require the actor to control the third person's conduct are stated in [Sections] 316–19." RESTATEMENT (SECOND) OF TORTS § 315, cmt. c. Those sections, in turn, address the duty of a parent to control the conduct of their child (Section 316), the circumstances in which a master is responsible to control the conduct of their servant (Section 317), the duty of a possessor of land to control the conduct of a licensee (Section 318), and the duty of those who "take[] charge of a third person" (Section 319). *See id.* §§ 316–19.

The first three circumstances do not apply to Greyhound. Furthermore, while the Garretts insist that the fourth circumstance, "tak[ing] charge of a third person," is applicable, they provide no compelling argument for applying that standard to its relationship with Wilson.

The Garretts' argument for imposing a duty on Greyhound begins with the supreme court's opinion in *Otis*. In that case, an employer instructed its employee to drive on a public road, knowing that he was intoxicated. 668 S.W.2d at 308. We have recently recognized that, under the standard that was established by the supreme court in *Otis*, an employer cannot engage in an affirmative act of control over an employee that is negligent, thereby exposing the public to harm. *Herrera v. CWJ Forklift Serv., LLC*, No. 11-24-00019-CV, 2026 WL 246983, at *5–6 (Tex. App.—Eastland Jan. 30, 2026, no pet. h.). In *Herrera*, we concluded that, when the employer therein instructed an intoxicated employee that he should *not* drive, such an act was neither an affirmative act of control, nor was it negligent. *Id.* at *5. As such, the employer was not responsible for a subsequent motor vehicle accident that was caused by the employee's intoxication. *Id.*

11

We do not comment on the circumstances in which the principles enunciated in *Otis* can be applied outside of the employer-employee context. However, even if we assume that *Otis* could be extended to the relationship between a common carrier and its passenger, the actions of Greyhound in this instance do not rise to the level of an affirmative and negligent act of control over Wilson that could create a duty on the part of Greyhound to prevent Wilson from causing an unreasonable risk of harm to members of the general public. Greyhound did not instruct Wilson to do anything at all, much less to undertake an action that posed a danger to the public. It merely let him off the bus. Under such circumstances, Greyhound's control over Wilson was neither affirmative, nor negligent. *See id.*

In support of their argument that Greyhound had a duty to protect the general public from Wilson's conduct, the Garretts also point to *Missouri, K. & T. Ry. Co. of Tex. v. Wood*, 66 S.W. 449 (1902). In that case, a railroad company retained a surgeon to take charge of an employee that had broken out with smallpox. *Id.* at 450. The employee, who was "delirious with fever," was then quarantined in a tent under guard. *Id.* Subsequently, the employee escaped and exposed Wood and his child to smallpox. *Id.* The supreme court held that having taken charge of the employee, and having undertaken to isolate and prevent him from spreading the disease, the employer was responsible for exposing Wood and his child to the disease. *Id.* at 450–51.

Although the railroad company in *Wood* was, like Greyhound, a common carrier, its duty to exercise ordinary care was not based on its role as a common carrier, but on its role as an employer who had assumed responsibility for restraining an incapacitated employee. *Id.* Furthermore, and contrary to the assertions that are made in the Garretts' brief, the employee who exposed Wood to smallpox was not a "passenger who got off the train and infected Wood." *Id.* Instead, a duty was

12

imposed in *Wood* because the employer had explicitly assumed responsibility for protecting others from exposure to a disease by a "delirious" employee. *Id.* at 450. In this instance, Greyhound never made an explicit agreement with anyone to put Wilson in custody or to otherwise protect the public from his conduct.

We conclude that Greyhound did not "take charge" of Wilson in a manner that obligated it to protect the general public from harm, as contemplated in Section 319 of the Restatement (Second) of Torts. Instead, when it removed Wilson from the bus, Greyhound severed the carrier-passenger relationship between the two, ending any ongoing obligations that it may have assumed by accepting him as a passenger earlier in the day.

The Garretts also point to the decision by the San Antonio Court of Appeals in *Kenyon v. Elephant Ins. Co., LLC*, 628 S.W.3d 868 (Tex. App.—San Antonio 2020), *rev'd*, 644 S.W.3d 137 (Tex. 2022). In that case, the court cited Section 314A of the Restatement for the proposition that special relationships include the relationship of "common carrier to passenger." *Id.* at 887; RESTATEMENT (SECOND) OF TORTS § 314A(1).

Section 314A is inapplicable in the present case for at least two reasons.

First, the issue in *Kenyon* was not whether a common carrier owes a duty to the general public to protect it from the conduct of one of its passengers. Instead, *Kenyon* posed the question of whether, under the narrow facts of that case, an insurance company should have taken steps to avoid injury to an insured who was at an accident scene. 628 S.W.3d at 902–03. In that case, an insured, acting at the behest of the insurer, was standing on a roadside and photographing damage to his vehicle when he was struck by a second vehicle that had lost control as a result of rainy conditions. 628 S.W.3d at 878–79. As such, the holding in *Kenyon* has nothing to do with the relationship between common carriers and their passengers.

13

Second, and more importantly, the portion of the Restatement which is cited by the *Kenyon* court is unrelated to the issue in this case. Section 314A concerns "Special Relations Giving Rise to [a] Duty to Aid or Protect." RESTATEMENT (SECOND) OF TORTS § 314A (title). It provides that "[a] common carrier is under a duty *to its passengers* to take reasonable action . . . to protect them against unreasonable risk of physical harm." *Id.* § 314A(1) (emphasis added). It does not concern the duty that a common carrier may owe to protect the general public from the conduct of its former passengers.

Finally, we note that several of the Garretts' arguments are based on claims that Greyhound failed to follow its own internal policies. For example, the Garretts maintain that Greyhound corporate policy required Owens to complete an incident report for corporate headquarters and to instruct his passengers to complete loading slips. They also maintain that Greyhound corporate policy required Owens to notify law enforcement that Wilson had been dropped off in Eastland.

It is possible that some of these policies were created to protect the general public from the dangerous conduct of former Greyhound passengers such as Wilson. Nevertheless, even if they were created for such a purpose, they do not alone create a standard of care. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004) ("[A] company's internal policies 'alone do not determine the governing standard of care.'") (quoting *Fence v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex. App. —Beaumont 1999, pet. denied)); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 351 (Tex. App.—Beaumont 2010, pet. denied) ("A company's internal policies or procedures will not create a negligence duty where none otherwise exists."); *Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex. App.—Dallas 2007, no pet.) ("The Texas Supreme Court has refused to create a standard of care or duty based upon internal policies, and the failure to follow such

14

policies does not give rise to a cause of action in favor of customers or others."). We therefore reject any argument that, by creating internal policies regarding the reporting and documentation of incidents on its buses, Greyhound somehow took on a duty to protect the general public from the criminal conduct of its former passenger. We furthermore reject any argument, whether based on the Restatement or otherwise, that a common carrier owes a general duty to protect members of the public[4] from the conduct of its passengers, or former passengers.

The Garretts also contend that Greyhound owed a duty to Lyndell to protect him from the conduct of Wilson as a result of its alleged negligence in undertaking to remove Wilson from the bus. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) ("[W]e have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation."). However, the Garretts failed to file a pleading that asserted this claim in a timely manner.

"A defendant moving for summary judgment is required to meet the plaintiff's causes of action as they are pleaded and to demonstrate that the plaintiff cannot prevail on those claims." *MedStar Funding, LC v. Willumsen*, 650 S.W.3d 809, 813 (Tex. App.—Houston [14th Dist.] 2022), *opinion supplemented on denial of reh'g*, 651 S.W.3d 569 (Tex. App.—Houston [14th Dist.] 2022, no pet.). However, a defendant is not required to develop summary judgment evidence regarding claims that are not a part of the pleadings. *Id.*

In Texas, pleadings must "provide fair notice of the claim and the relief sought such that the opposing party can prepare a defense." *In re Lipsky*, 460 S.W.3d 579,

---

[4]We do not comment on the duty, if any, of a common carrier to protect its own passengers from the conduct of other passengers. That question is not directly at issue under these facts. *See Parrilla v. King Cnty.*, 157 P.3d 879, 887 (2007) ("It is true that [in Washington] a common carrier of passengers owes the highest degree of care to protect its passengers from harm. However, that duty is one owed to the passengers themselves, not a duty owed to third parties.") (citations omitted).

590 (Tex. 2015) (orig. proceeding) (citing TEX. R. CIV. P. 45, 47). Under this standard, a pleading must give notice of the essential facts, as well as the cause of action that is asserted and the relief that is sought. *In re First Reserve Mgmt., L.P.*, 671 S.W.3d 653, 661–62 (Tex. 2023) (orig. proceeding). "Providing only fair notice of factual allegations does not provide fair notice of claims or causes of action asserted based on those alleged facts." *Montelongo v. Abrea*, 622 S.W.3d 290, 300 (Tex. 2021). Furthermore, a claim based on one variation of a cause of action will not ordinarily support a claim based on alternative variations. *See Huff Energy Fund, L.P. v. Longview Energy Co.*, 482 S.W.3d 184, 194, 197–98 (Tex. App.—San Antonio 2015), *aff'd*, *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 878 (Tex. 2017) (finding that plaintiff who had properly pled a breach of fiduciary duty "by taking a corporate opportunity," had not pled a breach of fiduciary duty "by engaging in competition").

Under our "fair notice" rules, a party's omission of a cause of action is not fatal to the pleading if the cause of action "may be reasonably inferred from what is specifically stated." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993). Additionally, although the pleadings are generally construed liberally in favor of the pleader when special exceptions have not been filed, *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982), a defendant is not under an obligation to file special exceptions seeking clarification regarding a cause of action that cannot be reasonably inferred from the existing pleadings. *Huff Energy*, 482 S.W.3d at 198.

Prior to filing their second amended petition, the Garretts had asserted that Greyhound was negligent based on (1) "its ordinary duty to exercise ordinary care" and (2) based on its duty as a common carrier. However, they had not asserted a claim against Greyhound based on the theory that Greyhound assumed a duty to Lyndell based on the "undertaking" of removing Wilson from its bus.

16

Rule 63 of the Texas Rules of Civil Procedure states that, while parties are generally free to amend their pleadings, "pleas offered for filing within seven days of the date of trial or thereafter . . . shall be filed only after leave of the judge is obtained." TEX. R. CIV. P. 63. Furthermore, "[a] summary judgment proceeding is a trial within the meaning of Rule 63." *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988).

There is no indication in the record that the Garretts secured leave from the trial court before they filed their second amended petition on January 19, only three days before the hearing to reconsider Greyhound's motion for summary judgment. There is likewise no indication the trial court considered the amended pleading as a part of the proceedings on the motion for summary judgment. *See id.* ("[I]n the absence of a sufficient showing of surprise by the opposing party, the failure to obtain leave of court when filing a late pleading may be cured by the trial court's action in considering the amended pleading."). Accordingly, the Garretts' cause of action for negligent undertaking was not before the trial court at the time of the hearing on the motion for summary judgment, and Greyhound was not obligated to develop summary judgment evidence in connection with those claims. *See MedStar*, 650 S.W.3d at 813.

B. *Proximate Cause*

Furthermore, even if we were to conclude that Greyhound somehow owed a duty to protect the general public from Wilson's conduct, we would still conclude that, in removing Wilson from the bus several hours before the incident in question, Greyhound's conduct was not a substantial factor in bringing about the incident. The incident occurred long after Wilson was dropped off, and it did not occur at or near the location where he was dropped off. At best, Greyhound merely created one of

17

the conditions that placed Wilson at the Eastland Wal-Mart later that day. *See Werner*, 719 S.W.3d at 528.

Under the substantial factor test, Greyhound cannot and should not be held responsible for the conduct of Wilson in perpetuity, and we conclude that the events on the bus from earlier in the day are too attenuated from the subsequent incident to qualify as a substantial cause. *See Lear Siegler*, 819 S.W.2d at 472.

### C. *Conclusion*

Because the trial court properly granted Greyhound's motion for summary judgment, we overrule the Garretts' first issue.

*Wal-Mart's Motion for Summary Judgment*

Like Greyhound, Wal-Mart sought summary judgment on both traditional and no-evidence grounds on the issues of duty and proximate cause.

### A. *Duty*

Wal-Mart sought a traditional summary judgment on the grounds that it had no duty to prevent the fatal assault because "the risk of crime was not foreseeable" and because Lyndell was not a "foreseen victim."

Where a claim for negligence is brought against a landowner, such a claim may be based on its acts of ordinary negligence (malfeasance) or its failure to act (nonfeasance). *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775–76 (Tex. 2010). The former category of cases are often described as "negligent activity" cases, and the latter are classified as "premises liability" cases. *Id.* In this instance, the Garretts have asserted both categories of claims.

### 1. *Negligent Activity*

The Garretts assert that Wal-Mart engaged in negligent activity because it sold a pocketknife and alcohol to Wilson. However, as a matter of law, neither of these activities can serve as the basis for a negligence claim.

18

A landowner can be held liable for negligent activities only if its allegedly negligent conduct is *contemporaneous* with the injury. *Id.* at 776 ("[N]egligent activity encompasses a malfeasance theory based on affirmative, *contemporaneous* conduct by the owner that caused the injury." (emphasis added)); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) ("Recovery on a negligent activity theory requires that the person have been injured by or as a *contemporaneous* result of the activity itself rather than by a condition created by the activity." (emphasis added) (quoting *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992)). In this instance, the sale of the items in question to Wilson occurred hours before the assault. Because the sale of the items in question did not take place contemporaneously with the assault, they cannot form the basis for liability arising out of a landowner's negligent activity.

The Garretts' claims against Wal-Mart arise out of its role as a landowner, rather than a seller of chattel. Nevertheless, even if the Garretts had alleged claims against Wal-Mart based on its liability as a seller, such claims would not be cognizable under Texas law.

Liability for supplying chattel to others is governed by the law of negligent entrustment. *See* RESTATEMENT (SECOND) OF TORTS § 390, cmt. c ("The rule stated in this Section [addressing claims for negligent entrustment] sets out the conditions under which a supplier of a chattel is subject to liability.") Under the law of negligent entrustment, "[a] person who gives a chattel to another, knowing the other person . . . is likely to use the chattel in a manner involving unreasonable risk of harm to himself or others, may be held liable for harm caused by the use of the chattel." *Prather v. Brandt*, 981 S.W.2d 801, 806 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Texas courts have recognized a cause of action for negligent entrustment of motor vehicles, and even firearms in situations where the owner of

19

the chattel allows it to be used by others. *See id.*; *see also 4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 909 (Tex. 2016). However, our supreme court has expressly stated that no cause of action for negligent entrustment is available against the *seller* of chattel, even when the chattel is a firearm. *In re Acad., Ltd.*, 625 S.W.3d 19, 31 (Tex. 2021) (orig. proceeding). Accordingly, the sale of a pocketknife to Wilson cannot serve as a basis for imposing a duty on Wal-Mart to protect its customers from Wilson's subsequent conduct.

By contrast, the sale of alcohol may sometimes serve as a basis for imposing liability on the seller. *See* TEX. ALCO. BEV. CODE ANN. § 2.02(b) (West 2020) (providing the circumstances under which the seller of alcoholic beverages may be held liable for subsequent damages). However, any such claim must be asserted under the Alcoholic Beverage Code. *See id.* § 2.03 ("The liability of providers under this chapter for the actions of their employees, customers, members, or guests who are or become intoxicated is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages."). The Garretts have not asserted a claim for a violation of the Alcoholic Beverage Code in this matter, nor have they attempted—on summary judgment—to establish genuine issues of material fact with respect to the elements of such a claim. Instead, they have asserted a claim for negligent activity arising out of the sale of alcohol. That claim is expressly barred under Section 2.03 of the Alcoholic Beverage Code.

We conclude that the sale of a pocketknife and alcohol to Wilson cannot form the basis of a legally cognizable claim. As such, the Garretts have failed to demonstrate that Wal-Mart owed or violated a duty under the theory of negligent activity.

### 2. *Premises Liability*

Although there is generally no legal duty to protect another from the criminal acts of a third person, those in control of premises "have a duty to use ordinary care to protect invitees from criminal acts of third parties if [they] know[] or [have] reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Timberwalk*, 972 S.W.2d at 756 (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997)).

In *Timberwalk*, the supreme court enumerated several factors that should be considered when determining whether a landowner owes a duty of care to its invitees based on the existence of prior criminal conduct on or near the premises. *Id.* at 757. However, the presence of prior criminal conduct is not the only means by which a landowner may be held responsible for such conduct on its premises. *See Del Lago*, 307 S.W.3d at 768. Courts may also consider the "nature and character of the premises" itself. *Id.* (recognizing that violent activity is more likely in bars, where intoxication may lead to aggressive behavior). Likewise, criminal misconduct may sometimes be foreseeable "because of immediately preceding conduct." *Id.* at 769.

The supreme court's decision in *Del Lago* addresses the latter situation. In that case, an individual who was attempting to intervene in a bar "brawl" was injured when his head was slammed into a wall, causing his face to hit a stud. *Id.* at 764, 766. There was evidence that, prior to the brawl that caused the injury in question, two factions had been arguing with each other inside the bar. *Id.* at 765–66. One of the factions comprised members of a fraternity, and the other one comprised members of a wedding party. *Id.* at 765. Several heated confrontations had erupted between intoxicated members of each faction, and—prior to the brawl that led to the injury in question—that there had been "at least two physical incidents." *Id.* These

21

events were directly observed by a waitress who was employed by the bar. *Id.* at 765–66.

The tensions between the parties "finally came to a head" when the bar staff attempted to close the bar, funneling all of the customers through a single exit, and "prompting a free-for-all" that led to the injury in question. *Id.* at 766.

After considering the facts that were before it, the supreme court stated that, where a landowner "knows or has reason to know that the [violent] acts of [a] third person are occurring, *or are about to occur*[,]" the landowner is under a duty to take action. *Id.* at 769 (quoting RESTATEMENT (SECOND) OF TORTS § 344, cmt. f (A.L.I. 1965)); *see also* RESTATEMENT (SECOND) OF TORTS § 344, cmt. f ("If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection."). The court observed that this duty existed, in part, because "the party with the power of control or expulsion is in the best position to protect against the harm." *Del Lago*, 307 S.W.3d at 769 (quoting *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993)). The supreme court then concluded that "Del Lago had a duty to protect [the plaintiff] because Del Lago had actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation." *Id.* at 769.

In reaching this conclusion, the court emphasized that it was not thereby announcing a general rule, and that its holding was limited to the facts that were presented therein. *Id.* at 770. Nevertheless, Texas courts of appeals have consistently derived at least two principles from *Del Lago*.

22

First, the courts of appeals have recognized that, where a landowner is charged with a duty to protect its invitees as a result of immediately preceding conduct, its knowledge must be "actual and direct." *Nguyen v. SXSW Holdings, Inc.*, 580 S.W.3d 774, 785 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("[W]hen the premises occupier lacks knowledge of specific previous crimes, a duty may still arise if the occupier has 'actual and direct knowledge' of 'imminent' criminal conduct." (quoting *Del Lago*, 307 S.W.3d at 769)); *Douglas v. Hardy*, 600 S.W.3d 358, 373 (Tex. App.—Tyler 2019, no pet.) ("[T]here is no evidence that [the defendant] had actual and direct knowledge of an imminent confrontation."); *Aikens v. Dueling*, No. 02-21-00320-CV, 2022 WL 3651976, at *7 (Tex. App.—Fort Worth Aug. 25, 2022, no pet.) (mem. op.) (finding no indication that a party "had direct knowledge of an imminent confrontation").

Second, there must be some indication that criminal conduct is "imminent." *Nguyen*, 580 S.W.3d at 785; *Douglas*, 600 S.W.3d at 373; *Aikens*, 2022 WL 3651976, at *7. Such an indication must be based on "immediately preceding conduct" by the assailant that qualifies as a "similar instance[] of violence." *ALNA Properties II, LLC v. Cobb*, No. 05-22-00166-CV, 2023 WL 5740182, at *5 (Tex. App.—Dallas Sept. 1, 2023, pet. denied) (mem. op.); *see Sudz Lounge 2 v. Martinez*, No. 08-23-00215-CV, 2024 WL 4831893, at *5 (Tex. App.—El Paso Nov. 19, 2024, no pet.) (mem. op.); *see also Taylor v. Louis*, 349 S.W.3d 729, 737 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (refusing to apply *Del Lago* in part because "the attack was not preceded by an extended period of threatening and aggressive behavior").

Mere evidence of erratic, and even agitated, behavior is insufficient to satisfy the requirement for immediately preceding and similar conduct. In *QuikTrip*, for example, the Fort Worth Court of Appeals considered whether a convenience store

was under a duty to protect one of its patrons from a sexual assault. *QuikTrip Corp. v. Goodwin*, 449 S.W.3d 665, 667, 671 (Tex. App.—Fort Worth 2014, pet. denied). The evidence in that case indicated that the assailant had been present on the premises of the convenience store for some time prior to the incident, asking at least two customers (including the victim) for a ride, and making at least three phone calls in an effort to find someone to pick him up. *Id.* at 667–68. There was evidence that the assailant was using profanity during his interactions with the store clerk, and that he claimed to have recently injured his brother in a fight. *Id.* at 667. There was also evidence that the assailant was pacing on the pavement outside the storefront, occasionally peering into the windows. *Id.* at 668. Based on these facts, and relying heavily on *Del Lago*, the Fort Worth Court of Appeals concluded that the "abduction, rape, and murder [of the victim], or even a violent and sexual crime against a stranger generally, were not foreseeable and probable results." *Id.* at 677. In reaching this conclusion, the court noted that the facts in the case that were before it did not mirror "the immediately preceding, observed conduct in *Del Lago* that foretold the immediately following assaultive act." *Id.* at 673. Thus, the conduct of the assailant in *QuikTrip*, though agitated and erratic, was not "palpable and escalating" in the same way as the conduct of the patrons in *Del Lago*. *Id.*

The existence or frequency of criminal activity at or near the Wal-Mart store in question is not at issue in this case. Likewise, there is no allegation that the "nature and character" of the Wal-Mart premises is itself more likely to attract violent actors. *See Del Lago*, 307 S.W.3d at 768. Rather, the Garretts raise the question of whether Wal-Mart had actual and direct knowledge that there was an imminent risk of criminal conduct on the part of Wilson.

We conclude that, as a matter of law, the evidence in this case does not support the two principles that we have described above.

24

First, there is no evidence that Wal-Mart had "actual and direct" knowledge of the conduct that the Garretts claim was overly aggressive. *Nguyen*, 580 S.W.3d at 785. The law of premises liability often creates a distinction between actual and constructive knowledge. "Actual" knowledge exists when a landowner is "actually aware" of a defect on the premises. *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex. 1996). By contrast, constructive knowledge exists when a landowner "after reasonable inspection should have known" of such condition. *Id.* at 3–4.

There are, of course, differences between a threat that is posed by a potentially violent individual and a premises defect. Nevertheless, the consistent use of the term "actual and direct" by both the *Del Lago* court and our sister courts of appeals suggests that a similar distinction should be made in cases involving potentially violent individuals. *See Del Lago*, 307 S.W.3d at 769; *Nguyen*, 580 S.W.3d at 785. Based on these similarities, we conclude that, when used within the context of a claim which seeks to hold a landowner liable for a third-party's actions based on immediately preceding conduct, evidence that the landowner could have acquired knowledge about conduct of the third-party by conducting a reasonable investigation is insufficient. Instead, the landowner (or its agents) must have actual awareness that violent conduct is imminent.

In this instance, there is no evidence that Wal-Mart possessed "actual and direct" knowledge of the erratic conduct of Wilson outside of the store, as the Garretts have described in their pleadings and briefing. Instead, the evidence indicates that a customer had reported such behavior to an employee of the store, and that the customer had also suggested that Wal-Mart investigate further. Any knowledge that Wal-Mart gained from this report was indirect. Furthermore, while Wal-Mart may have learned more about the situation by conducting an investigation, it was under no duty to do so.

25

We likewise conclude that, even if Wal-Mart had "actual and direct" knowledge of Wilson's erratic behavior, as described by the Garretts, there is no evidence that violent criminal conduct was "imminent." The evidence indicates that Wilson was glaring at customers and following them around the parking lot. Such conduct does not rise to the level of "similar instances of violence," that qualify as an indication of "imminent" criminal conduct. *See ALNA Props.*, 2023 WL 5740182, at *5; *see also QuikTrip*, 449 S.W.3d at 677.

We have no doubt that Wilson's conduct was unnerving to Hill and possibly to other customers who were on the premises at the time. We likewise do not discount the possibility that a person's instincts may sometimes accurately detect the presence of someone who poses a danger based on their erratic behavior. However, reports of uneasy feelings, no matter how strong they may be, are not sufficient to give rise to liability on the part of a landowner. For this reason, we conclude that, although Wilson's conduct was erratic and even distressing to at least one customer, it was not sufficient to place Wal-Mart on notice of an imminent violent assault. *See QuikTrip*, 449 S.W.3d at 667–68.

As was the case with Greyhound, much of the Garretts' briefing on this issue is focused on Wal-Mart's internal policies. For example, the Garretts point out that Wal-Mart policy prohibits customers from loitering outside the store, charging their phones with outdoor outlets, and consuming alcohol on the premises. Likewise, the Garretts argue that it was a violation of Wal-Mart's policies to "sell alcohol or a knife to a person who might be on drugs or intoxicated or have mental illness." For the reasons that we have already stated, we reject any argument that Wal-Mart's internal policies created a duty to prevent the assault. *See, e.g., FFE Transp.*, 154 S.W.3d at 92.

B. *Proximate Cause*

We also reject the Garretts' argument that the incident in question was reasonably foreseeable. *See Nixon*, 690 S.W.2d at 549–50. While erratic, Wilson's behavior both inside and outside the store did not become violent until the fatal assault in question. Furthermore, while Hill may have believed that Wilson was preparing to harm someone, there is no indication that any Wal-Mart employees had developed similar concerns. Likewise, there is no indication that Wal-Mart employees had developed other concerns that distinguished Wilson from the "other odd people" (as assistant general manager Christian described them) that come into the store. Given these circumstances, we cannot say that the summary judgment evidence is legally sufficient to support the Garretts' claim of proximate cause. *Id.*

C. *Conclusion*

Because the trial court properly granted Wal-Mart's motion for summary judgment on the issues of duty and proximate cause, we overrule the Garretts' second issue.

*This Court's Ruling*

We affirm the summary judgment orders of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


March 26, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

27